Hoyt and another vs. McLaughlin.

*April 20 — May 10, 1881.*

*Surcharging or falsifying an account stated.*

1. Where parties have mutually stated an account of their dealings with each other, and have adjusted balances on the basis of such statement, the account will not be surcharged or falsified at the suit of either party, without clear and satisfactory proof of fraud or mistake.

2. On the evidence in this case (for which see the opinion), this court is of the opinion (contrary to the findings of the court below) that no mistake or fraud as against the plaintiffs is clearly or satisfactorily shown, and therefore reverses a judgment rendered in their favor.

APPEAL from the Circuit Court for *Fond du Lac* County.

From June, 1871, until May, 1875, the parties to this action were partners in the wholesale liquor business in the city of Milwaukee. In May, 1875, the defendant sold out his interest in the business to one Toombs, and the partnership thereby terminated. The partners thereupon adjusted their individual accounts with the firm and settled the same. This settlement was made on the basis of the account books of the firm, which purported to contain the true account of each partner with the firm. These books were kept by or under the direct super-

Hoyt and another vs. McLaughlin.

vision of the defendant, although the other partners had free access to them. It does not appear, however, that either of the plaintiffs ever scrutinized the books very closely during the continuance of the partnership. This action was brought to falsify certain credits to the defendant, and entries in the accounts of different persons or firms contained in such books of account, and to surcharge the account of the defendant contained therein (and which was the basis of the settlement) with the amount of such false entries. The nature and particulars of these charges and credits are shown by the findings of fact filed by the circuit judge, which are as follows:

"(1) That the defendant, *McLaughlin*, had charge of the finances and books of accounts of said firm of McLaughlin & Hoyt, and that while he so had charge of said finances and books of account, to wit, on or about the 23d day of February, 1875, he drew the check of said firm upon the Wisconsin Marine & Fire Insurance Company's Bank, of Milwaukee, against the account of said firm, for the sum of $1,000, and collected the same, and converted the money so collected to his own use, without charging the same to himself on the books of said firm, but that he surreptitiously falsified the account of the Urbana Wine Company on the books of said firm, and charged the said money to the said company, and raised the said account of said company on said books sufficient to meet such charge. (2) That on or about the 19th day of November, 1873, the said *McLaughlin*, so having charge of the finances and accounts of said firm, appropriated of the moneys of said firm the sum of $143.25 to his own use, and without charging the same to himself on the books of said firm, but that he charged the said sum on the books of said firm to the account of the firm of Ellis & Curtis, and raised the said account of the said firm of Ellis & Curtis on said books sufficiently to balance such account. . (3) That the said defendant, *McLaughlin*, while so in charge of the books and finances of said firm, falsely credited himself on the books of said firm, on the 3d day of April,

1872, with the sum of $224.91, which was not paid into said firm by said *McLaughlin*, nor was any consideration given by him for such credit. (4) That the said defendant, *McLaughlin*, while so being in control of the finances and books of account of said firm, did, on the 31st day of December, 1873, credit himself on the books of said firm with the sum of $115, the proceeds of a wagon sold to one Dusing, which sum had already been credited, on or about the first day of July, 1873, to said *McLaughlin*, on the books of said firm; and that there was no consideration for such credit of said 31st day of December, 1873. (5) That neither of the plaintiffs had any knowledge or information of the appropriation of said several sums hereinbefore mentioned, until the month of January, 1876. (6) That the business of said copartnership has never been settled as between the copartners *Kinney* and *Hoyt*, the said plaintiffs, and that, as between themselves, they are joint tenants of the partnership property remaining. (7) That the said defendant, *McLaughlin*, sold his interest in said firm to one Benjamin Toombs, after he, *McLaughlin*, so appropriated said moneys, and that said *Kinney* and said *Hoyt* have acquired the interest of said Toombs in the business." The conclusion of law therefrom is, "that the said plaintiffs, *Kinney* and *Hoyt*, are entitled to recover against said defendant, *McLaughlin*, two-thirds of the various sums so appropriated, with interest at the rate of seven per cent. per annum from the dates when they were so appropriated, as aforesaid, which two-thirds of said sums and interest, as aforesaid, amount to the sum of $1,398; and the costs of this action to be taxed." Judgment was rendered accordingly for the plaintiffs; from which the defendant appealed. The evidence given on the trial is sufficiently stated in the opinion.

For the appellant there were briefs by *Flanders & Bottum*, and oral argument by *Mr. Flanders* and *H. M. Finch*.

For the respondents there was a brief by *E. Mariner*, their

attorney, with *Frank M. Hoyt*, of counsel, and oral argument by *Mr. Hoyt*.

LYON, J.   The law favors settlements, and courts will not open or disturb them but for very cogent reasons.   Hence, when parties have mutually stated an account of their dealings with each other, and have adjusted balances on the basis of it, nothing short of clear and satisfactory evidence of fraud or mistake will justify the falsifying or surcharging of such account. *Marsh v. Case*, 30 Wis., 531; *Klauber v. Wright*, herewith decided.   The evidence in this case is very voluminous.   It has been carefully examined.   We shall not attempt to review it, or even to state it in detail. .  In the view we have taken of the case it is unnecessary to do either.   Reference to those portions of it bearing most directly upon the propositions upon which our judgment is based, must suffice.   The defendant admits and testifies that the entries in the books mentioned in the several findings of fact do not show the true character of the transactions which gave rise to them; but he claims and testifies that they do represent actual transactions of the firm; that they are correct in amount, and do not disturb or change the true balance of any account contained in the books.   This is his explanation of these entries.   At different times he had purchased what he calls *cheap liquors;* that is, as we understand the term, liquors upon which the duties or the internal revenue taxes due the government had not been paid.   These purchases were necessarily made very privately.   He did not know the name of his vendor, only that he was called "Cheap Harry."   The liquor was received into the store in the night. Only the most confidential employees of the firm were let into the secret, and these no further than was absolutely necessary. To avoid the scrutiny of government officers and detectives, who during the time of these operations were especially alert to detect frauds on the revenue, it became necessary to exclude from the books of the firm all traces of these illicit transac-

tions.   At the same time it was deemed essential that entries of them in some form should be made in the books of the firm.   So, instead of opening an account with "Cheap Harry," or with "illicit liquor," and entering therein these purchases, he entered them as stated in the findings of fact.

The outlines of this system may be illustrated thus: The defendant makes a purchase of "Cheap Harry," amounting say to $1,000, and pays him that sum in cash belonging to the firm.   It will not do to charge this sum to merchandise account, and credit cash account therefor, without naming the person or firm of whom the purchase was made, and to whom the money was paid.   The expert who examines the books in the interest of the government may manifest some curiosity on that subject.   Neither will it be safe to enter the merchandise as received from, or the price as paid to, "Cheap Harry," for the detectives may know too much about him.   Hence, to overcome these probable difficulties, he credits the Urbana Wine Company (with which the firm has dealings) with the merchandise which that company never delivered, and charges it with a corresponding sum in cash which it never received. It is obvious that, when the merchandise account is charged with the purchase, and the sum paid "Cheap Harry," in fact, but fictitiously charged to the Urbana Wine Company, is entered to the credit of cash, all the balances will be precisely the same as though the actual transaction, and that alone, had been truly entered in the books.   The illustration here given does not show the actual facts of the fictitious entries testified to by the defendant.   He testifies that, for greater confusion, the amounts paid for illicit liquor were divided in some cases, and entered under different dates; that some of them were manipulated so that they were filtered through the bills-payable account, and that other fictions were introduced to get upon the books credits to himself for money which he advanced to pay for some of these secret purchases.   For example, the item of $224.91, charged to him by the circuit court,

is entered in the books as a credit "by error," and the $115 item "by merchandise." These two items, and the credit of $143.25 also charged against him by the court, he testifies, represent money paid by him out of his individual funds for "cheap liquor," which went into the stock of the firm. He further testifies that the plaintiff *Kinney* was cognizant of all these irregular transactions, but the latter denies that he knew anything about them until long after they occurred. The testimony leaves no doubt whatever of the fact that the plaintiff *Hoyt* had no knowledge or suspicion that the firm was dealing in illicit liquors.

It seems quite clear that, had the defendant opened in the firm books an account with "Cheap Harry," and entered therein all these contraband purchases, making the corresponding entries in merchandise and cash accounts, and omitting all of the fictitious entries, the balances of all of the accounts would have been precisely the same. Also, that if he purchased for the firm the several amounts of liquor of "Cheap Harry" which he testifies he did, and paid on account thereof, out of his individual funds, the sums which he placed to his credit by the fictitious entries, the balances are correct, notwithstanding the falsification of the accounts. The most important question to be determined is, therefore, Did the defendant make those contraband purchases on account of the firm? Or, rather, is his positive testimony that he did so, and that the liquor so purchased went into the general stock of the firm, clearly and satisfactorily impeached? Regard being had to the rule of evidence stated early in this opinion, the latter is the more accurate statement of the question. The defendant confessedly was engaged in defrauding the government of its lawful revenue, and to conceal the fraud he falsified and confused the account books of the firm. He did so without the consent or knowledge of one of his partners, at least. His position invites the closest scrutiny of his testimony. We think there are apparent discrepancies in some of his state-

ments — perhaps not very important; and he seems to have failed in some of the explanations of them which he professed to be able to make, and attempted to make. It may be, however, that his explanations would be satisfactory to an expert in the art of book-keeping. Unfortunately this court, as at present constituted, contains no such expert. These apparent discrepancies, and the defendant's failure to explain them, were marshaled by the learned counsel for the plaintiffs, and forcibly pressed upon the attention of the court in his very able argument of the case. Indeed, these are chiefly relied upon to support the judgment of the circuit court.

Were this an action to settle the accounts of the partners with the firm, and were the testimony of the defendant entirely uncorroborated, we should hesitate, as at present advised, to disturb an account stated by the court, in which the amounts of these fictitious entries were charged to the defendant. But we have no such case here. The court is not called upon to state accounts of the transactions and dealings of the several partners with the firm, and to adjust balances; but to falsify and surcharge the accounts thereof which the partners themselves have stated, and to overturn balances which they have voluntarily adjusted. We have seen that very different rules of evidence prevail in the two cases. Moreover, the testimony of the defendant is materially corroborated by that of two other witnesses, Ghent and Fricke, who were employed by the firm when the alleged transactions took place. Ghent testified that he received the liquors purchased of "Cheap Harry," which, it is claimed, are represented by the fictitious entries in the account of the Urbana Wine Company, and that he drew $1,000 from the bank on the check of the firm delivered to him by the defendant, and paid the amount to the vendor for such liquors. Fricke testifies that he clandestinely took into the store liquors purchased of the same man several times, and paid for them with money furnished by the defendant, and that the money so received and paid out by him corre-

sponds substantially in amount with the other fictitious entries in the books mentioned in the findings of fact; also that these transactions occurred about the time such entries bear date. If this testimony is true, it is probably a fair presumption that the money furnished Fricke by the defendant was his individual funds. Had it belonged to the firm, it seems that the credit given therefor to the defendant would have disturbed the cash balances. We discover no such disturbance therein. The testimony of these witnesses seems to have been candidly given, and the record discloses nothing (unless it be the fact that Ghent is a brother-in-law of the defendant) which can justly excite any distrust of the honesty of either witness.

There is some other proof which tends to corroborate and strengthen their testimony, and the defendant's theory of the case. When the defendant sold out to Toombs, or about that time, an invoice of stock was made. It satisfactorily appears that certain packages were entered therein as not invoiced. The defendant and Ghent both testify to the fact, and that these were part of the contraband purchases. This inventory was left in the possession of the plaintiffs, and was in their hands long after the defendant ceased to have access thereto. The plaintiffs were called upon to produce it, but they failed to do so, and denied all knowledge of it. A witness, who acted as a referee in an action between plaintiffs and Toombs, testified that this inventory was before him a year or more after the defendant sold out; that it was contained in a book; and we understand him to identify a book which the plaintiffs produced on the trial of this action as the one which then contained it. It was missing therefrom when the book was so produced. Several leaves had been cut out of it. Again, the defendant and Ghent both testify that opposite an entry under date of March 15, 1875, in the book known as the petty cash-book (which entry, it is claimed, represented the payment of the $1,000 by Ghent to "Cheap Harry"), the defendant made some memorandum showing the entry fictitious, and referring

his partners to him for an explanation. This book was also left with the plaintiffs, and was produced by them on the trial. But the leaf which contained the entry and the alleged memorandum had been cut from the book, and was not produced. Considerable testimony was introduced on behalf of the plaintiffs for the purpose of showing that no such memorandum was ever written there. But the mutilation of both the inventory book and petty cash-book, in portions which were claimed to contain important evidence for the defendant, is not satisfactorily explained. We may give the plaintiffs the full benefit of their denial of any knowledge of such mutilations, yet it is their misfortune that they were committed while the books were in their exclusive possession. Perhaps the maxim *omnia præsumuntur contra spoliatorem* should not be applied to them in its full rigor; yet under the circumstances they should be required to disprove the existence of the alleged entries by evidence more clear and convincing than we find in this record, or the positive testimony of their existence should be taken as true.

If there were entries in the inventory of packages as not invoiced, it is very significant, inasmuch as it does not appear that there was any uninvoiced merchandise in the stock except that purchased of "Cheap Harry." Again, if the petty cash-book contained the memorandum claimed, it is a strong circumstance to show that although the defendant was defrauding the government, he was not disposed to defraud his partners.

Further discussion or statement of the case seems unnecessary. Enough has been said to explain the grounds upon which our judgment is based. It must be held that the evidence of the alleged fraud of the defendant is not sufficient to justify the court in surcharging his account with the firm, which was the basis of the settlement of the parties.

*By the Court.*— Judgment reversed, and cause remanded with directions to the circuit court to dismiss the complaint.