HROUSKA, Respondent, vs. JANKE, Appellant.

*April 8 — May 15, 1886.*

*(1) Deed executed by person not named as grantor. (2) Attestation. Presumption. (3) Boundaries: Lost section line. (4) Verdict: Form: Waiver.*

1. A deed granting land is effectual to convey the interest of a person executing it, although he is not named therein as a grantor.
2. Although a deed was acknowledged by the several grantors on different days, in different counties, and before different officers, and is attested by but two witnesses, *non constat* that the grantors were not together when they executed it; and it will be presumed, therefore, that it was duly witnessed.
3. Instructions as to the determination of the true location of a section line when the original monuments are gone and the evidence fails to show where they were located, stating, among other things, that in questions of boundary, natural landmarks, marked lines, and reputed boundaries, especially if known to and acquiesced in by the parties interested, should be preferred to mere magnetic lines, and that all the testimony in the case should be considered, are *held* unobjectionable.
4. Where on the trial the form of the verdict was submitted to appellant's counsel for approval, and he did not object thereto, he cannot object on appeal.

APPEAL from the Circuit Court for *Kewaunee* County.

Ejectment to recover possession of a strip of land alleged to be a part of the northeast quarter of the southeast quarter of section 29, township 24 north, range 25 east, in Kewaunee county. The complaint was in the usual form. The answer, besides a general denial, contained a plea of adverse possession.

The plaintiff proved that the northeast quarter of the southeast quarter of section 29 was patented by the United States to one Abraham Blaser in 1858, and then offered in evidence the record of a quitclaim deed purporting to have been executed October 10, 1871, in which the grantors named are "J. Live and Abraham and John J. and Ben-

jamin and Alvina Blaser, children of A. Blaser," and the grantee is Anna Blaser. The deed was also signed by Henriette Hover and Martha Hansen. There were but two witnesses to the deed. It was acknowledged by the four grantors first named, on October 12, 1871, before a justice of the peace in Door county, and by Alvina Blaser, Henriette Hover, and Martha Hansen, on October 13, 1871, in Kewaunee county. There was evidence tending to show that the persons who executed the deed were seven of the eight children of Abraham Blaser, deceased, to whom the land was patented. The defendant objected to the admission of the record in evidence, but the objection was overruled. The plaintiff also introduced in evidence, against objection, a deed from Anna Blaser to August Feeger, dated in 1871, and a deed from Feeger and wife to himself, dated in 1881. All of said deeds purport to convey the northeast quarter of the southeast quarter of section 29, aforesaid.

Other evidence given on the trial, the charge to the jury, and other facts are sufficiently stated in the opinion. The verdict was in the following form: " We find for the plaintiff, and assess his damages at six cents." From a judgment in favor of the plaintiff as the owner of the undivided seven-eighths of the land described, the defendant appealed.

For the appellant there was a brief by *Timlin & Manseau,* and oral argument by *Mr. Timlin.*

For the respondent there was a brief by *Sedgwick & Byron,* and oral argument by *Mr. Sedgwick.*

Cole, C. J.   We do not think there was any error in admitting in evidence the record of the deed dated October 10, 1871.   This deed was admitted as a good conveyance from seven of the eight children of Abraham Blaser.   One objection to this deed is that two of the persons who signed and acknowledged it are not named in the body of the deed as grantors.   The learned counsel for the defendant says

that, in order to convey by grant, the party possessing the right to convey must be the grantor and use apt and proper words to convey to the grantee, and that merely signing, sealing, and acknowledging an instrument in which another person is grantor is not sufficient. Counsel relies upon *Agricultural Bank v. Rice*, 4 How. 241; *Catlin v. Ware*, 9 Mass. 218; *Lufkin v. Curtis*, 13 Mass. 223; and *Peabody v. Hewett*, 52 Me. 33,— to sustain his position. The deed in the case in Howard was by the *respective husbands* in right of their wives of the one part, and of the grantees of the other part, the husbands and the grantees being specifically named; and the parties of the first part granted to the parties of the second part. TANEY, C. J., says: " The lessors of the plaintiff are not described as grantors, and they use no words to convey their interest. It is altogether the act of the husbands, and they alone convey. . . . The deed in question conveyed the marital interest of the husbands in these lands, but nothing more." In *Catlin v. Ware*, where the deed was executed by her husband, the wife affixed her signature and seal, but her name was not otherwise mentioned in the deed, nor were there any words therein purporting or implying a release of her right of dower. The deed was acknowledged by the husband and recorded, but there was no acknowledgment by the wife. The court held that she did not release her dower. The same ruling was made in *Lufkin v. Curtis*. In *Peabody v. Hewett* it appeared that there were nine children of Solomon Peabody, who were the only heirs; that the demandants had the title of eight of them without dispute. It was supposed by both parties at the time of the trial that the interests of all the heirs were united in the demandants, and the verdict was rendered accordingly. Among the heirs was the son of the ancestor, William Peabody, who appears to have signed and sealed an instrument, supposed to be a perfect deed, to Sarah N. Patten, one of the demandants, but his name did

not appear in any other part thereof. No evidence was introduced to *show the death of William Peabody, and he was therefore supposed to be still living.* It was held that the instrument did not operate as a deed to convey the interest of William Peabody.

These cases, so far as we can ascertain the facts upon which they were decided, are distinguishable from the one at bar, and do not rule it. We are disposed to hold that the deed in question was effective as a conveyance of the interest of Henriette Hover and Martha Hansen, though their names were not mentioned in the body of the instrument. Prof. Washburn says: "It was once thought that the grantor should be named in the deed; but this does not seem to be necessary, if the grantor signs it." 3 Washb. on Real Prop. ch. 4, § 1, subd. 31.

Another objection to the record evidence is that the deed was not executed in the presence of two witnesses. It is certainly attested by two witnesses, and we must presume, under the circumstances, that it was duly witnessed. Counsel says the deed purports to be acknowledged by some of the grantors on different days, in different counties, and before different officers, while there are only two witnesses. But *non constat* the grantors were not all together when they executed the deed. It would be a most "violent and unreasonable presumption," in the absence of all proof to sustain it, to assume that they were not together.

The question involved in this case is as to the true section line between sections 28 and 29. Both are fractional sections, bordering on Lake Michigan. The plaintiff owns the N. E. $\frac{1}{4}$ of the S. E. $\frac{1}{4}$ of section 29; the defendant owns fractional section 28. The trend of the lake in that vicinity is about N. N. E., and the west shore cuts the section line at a point 60 to 65 chains south of the northeast corner of section 29. The meander posts on the south and east lines of section 29 are both lost. The east quarter post on

section 29 is lost, or in dispute. The parties agree upon the location of the south section line, of the west section line, of the north section line, of 29, and both start from the same northeast corner of this section. The controversy is as to the location of the section line which runs southerly from said northeast corner. As bearing upon that question, considerable testimony was introduced of surveyors who had attempted to establish the east section line; also of persons who claimed to know the location of that line from marked and bearing trees, and the position of the original quarter post. A certified copy of the field-notes of the original survey was offered in evidence. Two surveyors who surveyed the line at different times for the plaintiff started from the northeast corner of section 29, and ran due south, and with the aid of the field-notes claimed to have established the correct line. They describe fully the method of their respective surveys, and how they verified the accuracy of their work. But adopting the course and distance of these surveys,— which very nearly agreed,— and the meander distance of the line from the meander post on the south end of the east section line and the meander post at the east end of the south section line as stated in the field-notes, and the lines would not close. The plats and field-notes of the government survey show that this section 29 closed by a meander line 12.58 chains from meander post No. 2, at the intersection of the south line with the bank of Lake Michigan, to the meander post No. 3, at the intersection of Lake Michigan by the east line of the section. A third survey was made by another surveyor for the defendant. He started from the same northeast corner of section 29, and, instead of running due south, ran on a course 48 min. west of south, so as to close upon a point, as he determined, corresponding with the location of meander post No. 3, as given in the field-notes, and 12.58 chains in the proper direction from meander post No. 2, as above de-

scribed.   But, even according to his survey, the lines of the section did not close.   There was also much testimony as to where marked and bearing trees stood along the east line, and as to the location of the original quarter post.

The learned circuit judge gave a very full charge, stating, as we think, the law correctly which was applicable to the case.   Portions of the charge were excepted to, and such exceptions were relied on here for a reversal of the judgment.   It is said that the whole charge, taken together, was equivalent to a direction to find for the plaintiff; that the circuit judge in the charge seemed to be laboring under the impression that there were only two species of evidence to be considered in boundary cases:   (1) Direct evidence as to the location of the original posts; (2) evidence of a certain formula of surveying, which, if followed, conclusively established a line wherever the original posts were lost. Perhaps the best answer which can be given to these criticisms, and some others of a like nature, would be to give the charge itself as found in the bill of exceptions.   It is too long, however, to be quoted *in extenso.*   These excerpts must suffice.

The learned circuit judge, among other things, said: "The meander post at the east end of the south line of the section, and the meander post at the south end of the east line of the section, as located by the government survey, are gone, and the quarter post on the east line of the section is also gone; therefore you are to determine from all the evidence the true location of the east line of this section.   If the government quarter post was now standing as originally located, there would be no difficulty in determining the east line of the section; for the line would be a direct and straight line from the northeast corner of the section to the quarter post, and from thence, on a straight line, on the same course, to the south; so if the place where the original quarter post was located is shown by the evi-

dence, then the east line would be determined in the same way by running a straight line from the northeast corner of the section to the place where the original quarter post is shown to have been located by the government survey, and thence south by a direct extension of the line running through the place where the quarter post was so located. Has the location of the original quarter post been shown by the evidence? If you find where it was located by the government survey, that will materially aid you in determining the location of the east section line; for if you determine where the original quarter post was located by the government surveyors, then you go to the northeast corner of the section, and run a straight line to that quarter post at where it was located by the government surveyors, and thence on a straight line south to the lake; that would be the true boundary line of the east line of the section. You are to carefully examine and weigh all the evidence in regard to the government location of the quarter post on the east line of the section, and all of the evidence in regard to the blazed line, and all the other testimony and points relating to the matters in controversy, to determine the true boundary line on the east line of the section. You have the testimony, not only of witnesses,— not only what they claim to have been the true location of the quarter post,— but as well in regard to what a blazed line run through by the government surveyors, and other points in relation to the government survey. This testimony is proper for you to consider in determining and finding out where the true boundary line was. You have also the testimony of the surveyors in regard to where they run the line on the east section. The object of the surveys should be to find and locate the line where the government surveyors locate it, if they can do so; and that if the original survey can be found, and the original quarter post and meander post can be found, or their location ascertained with reasonable cer-

tainty, they must govern; that if the original quarter .post cannot be found, or its original location shown, it is a lost corner, and the same is true of the meander post at the south end of the east line of section 29,—that also will be a lost post if it could not be found or its location shown. In locating a government post at any established and recorded point, witness trees are usually set by the surveyors, and marked with the record of the bearing which they have when viewed or measured from the post actually set. . . . A marked line, also, when the marks are identified as the marks made at the time of the original survey, affords very strong evidence that the original post was set somewhere on such line. . . . If you are unable to decide from all the evidence offered in the case with reasonable certainty where the original posts on the line were located, or where the original line was located, then the posts and lines are lost, and they must be established by the way according to law."

The judge then states the proper way to establish the east line of fractional section 29, if the same is found to be lost. He said: "To make a survey of the east line of a fractional section like the one in suit, which is not full on the southeast corner, the surveyor should first try some of the original lines in the vicinity, or in the same section, if possible, to ascertain their course, and should also carefully chain them to compare his chain with the one used in the original survey. He should then locate such lost line by a right-angle survey running due south from the northeast corner of section 29 to the lake. In running due south from the northeast corner of section 29, the surveyor should take into consideration the fact that the government survey was supposed to be run on a true meridian, and he should also adopt such a line as will agree with the courses run by the original survey in the same section and vicinity, in the same town. It has been shown to you by the evidence that the meander line running along the lake shore is too short to

connect with the south meander post on the east line of the section with the east meander post on the south line of the section. This measurement of the meander line is of no importance whatever in the determination of the case, and should not be considered by you in arriving at your conclusions in this case. The plaintiff is required to establish, by a fair preponderance of the evidence, that one or both of the boundary lines claimed by him is the true line, before he can recover. . . . In questions of boundary, natural land-marks, marked lines, and reputed boundaries, especially if known to and acquiesced in by the parties interested, should be preferred, when they are in opposition to mere magnetic lines, unless there is a known mistake in the line as marked. You may consider, in determining the location of the boundary, the fact that in early times, when the opportunities for locating the true line as run by the government surveyors were better than now, the owners of adjoining lands erected their houses and fences to what they considered the true line. The acquiescence or agreement of the parties, or those under whom they claim, for a long number of years, is evidence to go to show where the true or original line was. The object of a survey like this is not to make or originate a new line or boundary between the parties, but to find out where the government lines were, and when the location of these lines is determined, such location is controlling. If, from all the evidence and all the facts and circumstances in this case, you find that the government quarter post originally located was on the line run by surveyors Borgman or Ertz, then the plaintiff would be entitled to recover; but if you find that such government quarter post was located on the final line run by surveyor Suydam, or west of such line, the plaintiff cannot recover; for then the true boundary line run from the northeast corner of section 29 to the quarter post, and thence on a direct line in the same course south, would run on a west line, or a line west of the strip of land in controversy. And in de-

termining the true location of the east boundary line of this section you are to take into consideration all the testimony which has been offered in this case."

In view of this charge, it seems idle to claim that any direction was given for the jury to find for either party, or that undue weight or importance was attached to any species of testimony. It is said the court did not allow the jury to consider the measurement of the meander line, as given in the field-notes, for any purpose. We cannot see that it was entitled to any effect in determining the proper boundary. By no survey made did the length of that line close the survey, and it did not therefore tend to prove the course which the original line run from the northeast corner of section 29.

It seems the court prepared two forms of a verdict,— one for the defendant generally, and the other as follows: "We find for the plaintiff, and assess his damages at six cents." The court asked the counsel for the respective parties if these forms of a verdict were proper to dispose of all the issues; and, if they were not, requested counsel to prepare such a form as he thought he was entitled to, in case the jury should find in favor of his client. Neither counsel objected to the form prepared by the court. It is now objected that the verdict is informal, and should be set aside. Under the circumstances, the objection should not prevail. The verdict amounts to a finding that the plaintiff is owner in fee of the strip in controversy. In fact, the judgment was entered for an undivided seven-eighths of the land, to conform to the proof.

We have noticed all of the points made by the defendant's counsel which we deem material.

*By the Court.*— The judgment of the circuit court is affirmed.

See note to this case in 28 N. W. Rep. 170.— REP.