CONTINENTAL NATIONAL BANK OF CHICAGO, Appellant, vs. McGEOCH and others, imp., Respondents.

*January 11 — February 18, 1896.*

*Debtor and creditor: Composition: Accord and satisfaction: Considera-
tion: Fraudulent preferences: Knowledge thereof by corporate
creditor: Evidence: Instructions: Matters included in settlement:
Disposition of collaterals: Appeal: Questions not determined in
trial court.*

1. The question being whether the plaintiff bank, when it accepted
fifty per cent. of its claim against an insolvent firm and gave a re-
lease in full, in pursuance of a compromise agreement, knew that
the claim of another creditor who was a party to said agreement.
had been paid or secured in full, a copy of a Sunday issue of a
newspaper, giving an account of the securing in full of such claim,
was admissible in evidence, where both the president and cashier
of the plaintiff were accustomed to take and read that paper,
although there was no evidence that either of them read or re-
ceived that particular issue.

2. Evidence was also admissible that a majority of the plaintiff's di-
rectors were members of the board of trade of which the insolvent
firm was a member, that its cashier was frequently there, and
that the securing of such other creditor in full became publicly
and generally known on said board of trade and in the city.

3. The jury were properly allowed to take into consideration the
matters above mentioned, with other circumstances tending to
prove knowledge on the part of the plaintiff, where they were
also instructed that plaintiff was not chargeable with the knowl-
edge of its directors acting as individuals, nor with the knowl-
edge of its officers having nothing to do with the compromise.

4. The mere fact that a person who was not a member of the insolvent
firm, but was liable for its debt to the plaintiff bank, on the day
of the failure of the firm gave collaterals to another of its debts for
which he was liable, and that that creditor thereafter voluntarily
signed the compromise agreement and settled for fifty cents on
the dollar, is not a ground for invalidating the settlement and dis-
charge of the debt to plaintiff.

5. A statement made by the receiver of the insolvent firm to its cred-
itors on the board of trade, soon after he had taken charge of its
affairs, in which he said that he found such affairs in great con-

Continental National Bank of Chicago vs. McGeoch and others.

fusion, but gave his estimate of assets, liabilities, etc., and presented and urged the acceptance of the proposition for a settlement at fifty cents on the dollar, is *held* not to have been false or fraudulent so as to invalidate the settlement.

6. The receiver, in submitting such proposition for settlement at fifty cents on the dollar, having stated that it would involve the necessity of the dismissal of all suits, attachments, etc., the settlement is not invalidated by his payment, in addition to said dividend, of the attorneys' fees incurred by certain creditors in attachment suits previously commenced.

7. The question being whether there had been fraudulent preferences which should invalidate a compromise and settlement by which creditors of an insolvent firm had accepted fifty per cent. of their claims in full discharge thereof, and it having been found that there was no such preference in any of the specific transactions relied upon in the trial court, the supreme court will not examine other transactions shown by the evidence but not specifically presented to or determined in the court below.

8. A composition agreement between a debtor and a portion of his creditors is valid and binding.

9. The fact that the validity of claims was questionable — as where money was borrowed to be used in an illegal attempt to corner the lard market, and there was ground for claiming in good faith that the lenders knew that fact at the time (even though a jury afterwards found that they did not then know it) — constituted a sufficient consideration for an accord and satisfaction or settlement by which the creditors received less than the full amount of such claims.

10. A compromise by which one member of an insolvent firm and a third person (who were individually liable for some but not all of the claims compromised) each agreed to contribute immediately a large sum of money to be used in settling all of said claims, and the creditors agreed to accept fifty cents on the dollar in full satisfaction thereof, was based upon a sufficient consideration and, when executed, constituted a binding accord and satisfaction.

11. The proposition made by the insolvent firm in such case to pay fifty cents on the dollar in cash as a "compromise, to be received by each creditor in full settlement and liquidation of all unsecured claims and the deficiencies upon secured claims," etc., the amount of each claim to be settled and adjusted by the receiver of the firm; the acceptance by the creditors of the "above settlement" "in consideration of the prompt settlement above proposed, and

to avoid litigation;" and the discharge by which creditors acknowledged receipt of the agreed dividend "as a full compromise and adjustment of the validity, and in final settlement, satisfaction, and discharge, of all claims and demands against said firm and individuals"— are *held* to show that the agreement was not a mere composition but was a final settlement and accord and satisfaction.

12. A creditor, in such case, having disposed of property held as collateral and applied the net proceeds thereof upon his claim, and having been paid by the receiver of the firm the agreed dividend of the balance remaining due, the time and manner of disposing of such collateral, and the amount realized therefrom, were matters covered by and included in the settlement, so that the debtors could not thereafter question the good faith or the diligence of the creditor in such disposition.

WINSLOW and PINNEY, JJ., dissent.

APPEAL from a judgment of the circuit court for Milwaukee county: D. H. JOHNSON, Circuit Judge. *Affirmed.*

This action was commenced June 19, 1888, by the service of the summons and complaint upon *Daniel Wells, Jr.,* and Peter McGeoch personally, but the other defendants were not served and did not appear in the case. Peter McGeoch died pending this appeal, and his executors are substituted as defendants in his place.

The amended complaint alleges that during the times mentioned the plaintiff was incorporated and doing a banking business in Chicago; that McGeoch, Everingham & Co. were copartners and brokers at Chicago; that the defendants McGeoch and *Wells* were copartners, engaged in buying and selling lard and other commodities on their joint account, at Chicago, through the firm of McGeoch, Everingham & Co., as their brokers and agents. It then alleges four separate causes of action, in which the plaintiff claims an alleged balance of $25,916.97, due on four promissory notes, made, indorsed, and delivered to the plaintiff in Chicago, as follows: (1) A note, dated May 10, 1883, with McGeoch, Everingham & Co., as makers, and *Wells* as indorser, due

August 10, 1883, for $150,000, upon which $149,412.47 had been paid on and prior to August 20, 1883, leaving unpaid thereon $587.53, and which recited that certain warehouse receipts for lard were held by the plaintiff as collateral security; (2) a note, dated May 10, 1883, with J. H. Peacock, one of the firm of McGeoch, Everingham & Co., as maker, and *Wells* and McGeoch, Everingham & Co. as indorsers, due August 10, 1883, for $100,000, upon which had been paid $89,750.80 on and prior to August 20, 1883, leaving unpaid thereon $10,249.20, with a similar recital; (3) a note, dated June 1, 1883, with the defendant Peter McGeoch as maker, and *Wells* and McGeoch, Everingham & Co. as indorsers, due August 1, 1883, for $150,000, upon which had been paid $143,900.86 on and prior to August 20, 1883, leaving unpaid thereon $6,099.14, with a similar recital; (4) a note, dated June 1, 1883, with *Wells* as maker, and McGeoch, Everingham & Co. as indorsers, due August 1, 1883, for $100,000, upon which had been paid, on and prior to August 20, 1883, $91,981.09, leaving unpaid thereon $8,981.09, with a similar recital. It alleges that said notes were severally given for money borrowed of the plaintiff for the benefit of *Wells* and McGeoch in their said business in Chicago, and that, after applying all payments and the avails of all collaterals, there remained due to the plaintiff, on said notes, $25,916.97, with interest from August 20, 1883; and prayed judgment for that amount.

The defendants *Daniel Wells, Jr.*, and Peter McGeoch separately answered, to the effect that *Wells* and McGeoch were accommodation makers or guarantors; that *Wells* and McGeoch made large purchases of lard through McGeoch, Everingham & Co. as their agents, and raised money for that purpose by discounting the notes in suit; that McGeoch, Everingham & Co. failed June 16, 1883, and a receiver of their property was then appointed; that the indebtedness of the said McGeoch, Everingham & Co. arose in an illegal

attempt to corner the market on lard, contrary to the laws of Illinois; that, at the request of said receiver, Peter Mc-Geoch and *Wells* respectively elected to waive defenses of illegality, and each to contribute $225,000 to effect a compromise and full settlement, on condition of obtaining a full discharge and release from each and all of said notes and all claims of the plaintiff, as well as other claims; that all creditors, knowing all the facts and that McGeoch and *Wells* were the firm's principal debtors, accepted such compromise and settlement; that Peter McGeoch and *Wells* each advanced and paid $225,000 to and through said receiver to obtain such compromise and settlement, and all creditors released *Wells* and McGeoch personally, as well as the firm of McGeoch, Everingham & Co.; that the plaintiff elected to treat McGeoch, Everingham & Co. as debtors, knowing that *Wells* and McGeoch were purchasing their release from the firm; and *Wells* and McGeoch, relying thereon, contributed to the compromise and settlement the amount of the respective sums stated. Each answer also set up an equitable counterclaim for accounting in respect to lard so held and sold by the plaintiff as collateral. *Wells* also, in effect, alleged payment; that the plaintiff was estopped from opening or setting aside said compromise and settlement; that the money was knowingly advanced by the plaintiff on said notes to assist in running an illegal corner. He claims application of the proceeds of the collaterals to the notes signed by him as maker, and that the plaintiff failed to sell the collaterals as requested. McGeoch's answer contained a counterclaim for the wrongful conversion of the lard. The plaintiff replied, and put in issue the several allegations contained in the respective counterclaims.

At the close of the trial the jury returned a special verdict to the effect (1) that the plaintiff, at and before the time of discounting the notes mentioned, did know that the firm of McGeoch, Everingham & Co. was engaged in an

Continental National Bank of Chicago vs. McGeoch and others.

attempt to corner the Chicago lard market, (2) but did not then know that the loan of $500,000, evidenced by said notes, was needed and procured by said McGeoch, Everingham & Co. for the purposes of carrying on said undertaking to corner said lard market; (3) that there was no agreement or understanding between the plaintiff and McGeoch, Everingham & Co. that said loan, or any specified part thereof, should be used for the specific purposes of carrying on said corner, and that there is no evidence in the case tending to show such agreement or understanding; (4) that the plaintiff did sign and deliver said composition agreement, upon the understanding and condition that the Union National Bank should sign the same, and that said bank and all creditors should accept fifty cents on the dollar; (5) that the plaintiff, before it accepted the fifty per cent. secured to it by said composition, and before signing the release of August 25, 1883, did know that said Union National Bank had been paid or secured its claim in full by the committee of creditors who circulated said composition for signature; (6) that Peter McGeoch did not, before said composition was signed by William Young & Co., promise to pay that firm in full; (7) that the plaintiff did not dispose of the lard pledged to it as collateral security for the notes in suit in good faith, (8) nor in the exercise of ordinary care and prudence; (9) that the plaintiff did realize and credit upon said notes, on account of said collaterals, a sum considerably less than could have been realized by disposing of said collaterals in good faith and in the exercise of ordinary care.

Thereupon the court found, as matters of fact, the following, in effect, to wit:

[The first, second, third, fourth, and fifth findings are sufficiently stated in the opinion.]

(6) That afterwards the said receiver of said firm called a meeting of all of the creditors of said firm who were members of said Board of Trade, and on July 2, 1883, a meeting of such creditors of said firm was held, and said receiver

submitted to such creditors, on behalf of said firm, a *proposition of settlement* in words and figures following, to wit:

"Chicago, Ill., July 2nd, 1883.

" *To the Creditors of the Firm of McGeoch, Everingham & Co., Represented upon the Board of Trade of the City of Chicago:* We submit the following *proposition of compromise*, to be received by each creditor *in full settlement and liquidation* of all unsecured claims, and the deficiencies upon all secured claims after applying the margins and collaterals up as security therefor, provided, this proposition shall *not be binding* upon us until each and all of said creditors have signified their acceptance hereof by signing the acceptance hereunder written.

"Proposition: We will pay fifty cents upon the dollar in cash within ten days from the date of the said acceptance hereof. The amount of each claim to be ·*settled and adjusted* by John R. Bensley, receiver: *provided*, that if said Bensley and any creditor cannot agree as to the amount of any claim, then, and in every such case, the amount of such claim shall be determined by the board of arbitrators of said Board of Trade in the mode prescribed by the rules of said board.          Respectfully submitted,

"McGeoch, Everingham & Co."

"We, the undersigned, creditors of the firm of McGeoch, Everingham & Co., in consideration of the *prompt settlement* above proposed, *and to avoid litigation,* hereby accept the above settlement as aforesaid.

"[Signed by the plaintiff July 20, 1883]."

Which said contract of *compromise* was signed by all of said creditors, including said plaintiff.

(7) That afterwards, and on August 25, 1883, the plaintiff executed and delivered to said receiver an instrument in writing, in the words and figures as follows, to wit:

"No. 183.          Chicago, Ill., Aug. 25th, 1883.

"Peter McGeoch, George S. Everingham, Frank A. Crittenden, John H. Peacock, and William R. Harvey. com-'

prising the firm of McGeoch, Everingham & Co., being in failing circumstances and unable to pay their debts in full: Now, in consideration thereof, and of the receipt of the sum of money hereinafter named, the undersigned creditor, *Continental National Bank of Chicago,* hereby acknowledges receipt from them, by the hand of John R. Bensley, receiver in chancery of their estate and effects, of the sum of twenty-five thousand, nine hundred sixteen ninety-seven one-hundredths dollars, as a full compromise and adjustment of the validity, and in final settlement, satisfaction, and discharge, of all claims and demands of the undersigned against said firm and *individuals.*

"$25,916.97.            JOHN C. BLACK, Cashier,
                              "Creditor."

(8) That said receiver paid the creditors of said firm, including the plaintiff, said fifty cents upon the dollar of their respective claims, and procured from all of them, including said plaintiff, a release of the debts of said firm and its individuals, and a dismissal and discontinuance of various suits and various garnishee attachment proceedings which certain of the creditors had brought against said firm and said *Wells.*

(9) That the first above mentioned agreement was circulated, and signatures thereto procured, *by a committee of creditors appointed* at the aforesaid meeting of the creditors, held July 2, 1883, and that, at the time of and prior to the execution of the aforesaid agreement of composition and the aforesaid release, the said receiver, Bensley, made no false or fraudulent statements or representations in respect to the assets or liabilities or the financial condition of said firm or of said *Wells.*

[The tenth and eleventh findings are substantially the same as the fourth and fifth findings of the jury.]

(12) That Peter McGeoch did not, at any time between July 2, 1883, and the signing of the composition by William Young & Co., promise to pay said firm of William Young & Co. in full.

(13) That the giving by said *Wells* of a mortgage to the National Bank of America upon his individual property, prior to July 2, 1883, as additional security for his liability upon the indebtedness of McGeoch, Everingham & Co. to said bank, constituted no fraud upon the plaintiff or the other creditors of said firm of McGeoch, Everingham & Co. in the procurement of its and their signatures to either said composition agreement or said contract of release. That neither said McGeoch, Everingham & Co. nor said *Wells* requested said Bank of North America to sign said composition agreement, but said bank voluntarily signed the same, and received the fifty per cent. provided for in the compromise, from the receiver of said firm, before resorting to or realizing upon the said mortgage given by said *Wells* as additional security for the indebtedness of said firm.

(14) That no fraud was used in the procurement of the signatures of the said plaintiff to said composition agreement, and that there was no fraud in the, procurement of the contract of *settlement and release* dated August 25, 1883.

(15) That the plaintiff did not dispose of the lard, pledged to it as collateral security for the notes in suit, in good faith, nor did the bank dispose of said lard in the exercise of ordinary care and prudence.

(16) That the plaintiff realized, and credited upon the notes in suit, on account of said collaterals, a sum considerably less than could have been realized had it disposed of said collaterals in good faith and in the exercise of ordinary care, and that, if said bank had disposed of said collaterals in good faith and in the exercise of ordinary care, it would have realized, with what was received from the receiver, more than enough to have paid in full the said indebtedness of McGeoch, Everingham & Co.

(17) That the claims set up in the equitable counterclaim of Peter McGeoch and *Daniel Wells, Jr.*, respectively, arose out of the transaction set out in the complaint, and are connected with the subject of this action, and that all such

claims were by the parties to this action, on August 25, 1883, *fully and fairly compromised and adjusted,* and that a *final settlement and satisfaction thereof* was had, and that said defendants are not entitled to recover, upon the said equitable counterclaims, any judgment for money against said plaintiff, and *that said compromise and adjustment* cannot be avoided in this action.

(18) *That the creditors* of said McGeoch, Everingham & Co., *including the plaintiff, knew* that said defendant *Wells* had agreed to furnish $225,000 out of his own funds for the purpose of *effecting said compromise* with said firm, which sum said *Wells* did so furnish, and the *same was used as a part of the moneys disbursed by said* receiver in the payment of fifty per cent. of the *indebtedness of said firm,* and thereby said plaintiff is *estopped* from questioning said composition or disputing its validity; and that the equitable estoppel pleaded by said *Wells* is well established and sustained by the evidence as to each cause of action set forth in the complaint.

(19) That said *Wells* was not guilty of any fraud which, it is claimed, invalidated the composition.

(20) That the debt upon which this action was brought was *fully and fairly compromised and released* by virtue of the composition of July 2, 1883, and the contract of release of August 25, 1883, which was signed by said plaintiff.

And, as conclusions of law the court found, in effect: (1) That the composition agreement of July 2, 1883, and the release executed by the plaintiff, August 25, 1883, above set forth, fully released and discharged the plaintiff's entire claim, and that there was no fraud in the making or procurement of either of the same. (2) That the defendants Peter McGeoch and *Daniel Wells, Jr.,* are not entitled to recover, on the equitable counterclaim set forth in their respective answers, any judgment for money against the plaintiff. (3) That said plaintiff is estopped from questioning the validity of said composition agreement and said contract of

Continental National Bank of Chicago vs. McGeoch and others.

release, above set forth, as against said *Wells,* and that said *Wells* is entitled to judgment against said plaintiff, upon this defense, dismissing said action as to said *Wells.* (4).That judgment be entered in favor of the defendants, dismissing the plaintiff's complaint, and for their respective costs of this action, to be taxed.

From the judgment entered thereon accordingly the plaintiff appeals.

For the appellant there was a brief by *Van Dyke & Van Dyke,* attorneys, and *J. G. Flanders,* of counsel, and a supplemental brief by *Van Dyke, Van Dyke & Carter,* attorneys, and *J. G. Flanders,* of counsel, and oral argument by *G. D. Van Dyke* and *J. G. Flanders.* They contended, *inter alia,* that the composition agreement is to be strictly construed against the debtor, and so construed it is conditioned on its acceptance by all creditors, and that condition never having been performed it is inoperative.    3 Am. & Eng. Ency. of Law, 390, 395, sec. 11; *Paulin v. Kaighn,* 27 N. J. Law, 503; *Doughty v. Savage,* 28 Conn. 146; *Durgin v. Ireland,* 14 N. Y. 322; *Cobleigh v. Pierce,* 32 Vt. 788; *Dauchy v. Goodrich,* 20 id. 127; *Chase v. Bailey,* 49 id. 71; *Turner v. Comer,* 6 Gray, 530; *Day v. Jones,* 150 Mass. 231; *Greer v. Shriver,* 53 Pa. St. 259; *Laird v. Campbell,* 100 id. 159; *Bean v. Brookmire,* 2 Dillon, 108; *Johnson v. Baker,* 4 Barn. & Ald. 440; *Tutt v. Price,* 7 Mo. App. 194; *Ware v. Allen,* 128 U. S. 590; *Burke v. Dulaney,* 153 id. 228; 28 Cent. L. J. 339; *Wilson v. Powers,* 131 Mass. 539.    Where any secret preference has been given either by the debtor or by any person for him, either with or without his direction, especially if he knows of it or afterwards ratifies it by claiming the benefit of it, the composition is void, and the creditor, without returning or offering to return the amount received, is at liberty to sue for the amount remaining unpaid. *Ex parte Milner,* 15 Q. B. Div. 606; *Bank of Commerce v. Hoeber,* 11 Mo. App. 475; *Bank of Commerce v. Hoeber,* 88 Mo. 37; *Kullman v. Greenebaum,* 92 Cal.

403; 20 Cent. L. J. 385; *Laird v. Campbell*, 100 Pa. St. 159; Greenhood, Pub. Pol. 142, and note; *Crans v. Hunter*, 28 N. Y. 389; *Mygatt v. Tarbell*, 78 Wis. 351, 354; Mechem, Agency, §§ 130, 146, *et seq.; Hefter v. Cahn*, 73 Ill. 296; *Enneking v. Stahl*, 9 Mo. App. 390; *Cobb v. Tirrell*, 137 Mass. 143; 3 Am. & Eng. Ency. of Law, 397, 398; 4 Southern L. Rev. 658, 661. A newspaper item is not notice to a corporation unless there is evidence that it was read by some officer of the corporation to whom notice could properly be given. *Rowley v. Horne*, 3 Bing. 2; *Lincoln v. Wright*, 23 Pa. St. 76; *Bank of Pittsburgh v. Whitehead*, 10 Watts, 397; 16 Am. & Eng. Ency. of Law, 822; *Vernon v. Manhattan Co.* 17 Wend. 524; *S. C.* 22 id. 183. All this is true of the week-day paper, and it applies with double force to the Sunday issue, because there are many people who do not take or read the secular Sunday paper, and ordinarily it is held that the publication of notices in Sunday issues is illegal. *Scammon v. Chicago*, 40 Ill. 146; *Shaw v. Williams*, 87 Ind. 158, 44 Am. Rep. 756; *Shaw v. Dodge*, 5 N. H. 462; *Smith v. Wilcox*, 24 N. Y. 353; 16 Am. & Eng. Ency. of Law, 822.

For the respondent *McGeoch* there were briefs by *Miller, Noyes, Miller & Wahl*, and oral argument by *Geo. H. Noyes.* They argued, among other things, that courts seize on any consideration, no matter how slight, to make an exception to the rule that payment of a part of an undisputed, legal, and liquidated debt does not discharge the same, although expressly received in satisfaction of it. Any legal interest or right not before received, anything of legal value in possession or in action, actually received in full satisfaction, will be conclusively deemed an accord and satisfaction of the debt. *Line v. Nelson*, 33 N. J. Law, 358; *Calkins v. State*, 13 Wis. 389, 394. See, also, *Mellen v. Goldsmith*, 47 Wis. 579; *Leeson v. Anderson*, 99 Mich. 247; *Boyd v. Moats*, 75 Iowa, 151; *Clark v. Abbott*, 53 Minn. 88; *Brooks v. White*, 2 Met. 283, 37 Am Dec. 95, note; *Guild v. Butler*, 127 Mass.

386; *Allison v. Abendroth*, 108 N. Y. 472; *Jaffray v. Crane*, 50 Wis. 349; *Goddard v. O'Brien*, 21 Am. L. Reg. 639; *Ellsworth v. Fogg*, 35 Vt. 355; *U. S. v. Child*, 12 Wall. 232; *Zimmer v. Becker*, 66 Wis. 527; *Curtiss v. Martin*, 20 Ill. 557; *Jones v. Perkins*, 29 Miss. 139, 64 Am. Dec. 136; *Fenwick v. Phillips*, 3 Met. (Ky.), 87; *Harper v. Graham*, 20 Ohio, 105; *Cleaveland v. Richardson*, 132 U. S. 318; 17 Cent. L. J. 303, § 3; Id. 304, § 9. This contract of release discloses a good consideration for the accord and satisfaction, so as to come within the exceptions to the general rule, in the following particulars: (1) The payment is made by a third person. (2) The claim discharged appears to have been unliquidated. (3) The claim appears to have been doubtful and disputed, its validity requiring adjustment. (4) Payment is shown to have been made by debtors in failing circumstances. (5) The payment was expressly made in compromise of a claim. The newspaper articles were admissible in evidence and sufficient to go to the jury as tending to charge notice upon the officers of the bank. *Gilchrist v. Brande*, 58 Wis. 184, 200; *Young v. Tibbitts*, 32 id. 79; *Treadwell v. Wells*, 4 Cal. 260; *Sisson v. C. & T. R. Co.* 14 Mich. 489; *Henkle v. Smith*, 21 Ill. 238. Current reports and general notoriety are admissible in evidence to charge a party with knowledge or notice of a transaction. *Brown v. Peck*, 2 Wis. 261; *Lovejoy v. Spafford*, 93 U. S. 430, 440.

For the respondent *Wells* there were briefs by *Fish & Cary*, and oral argument by *John T. Fish* and *J. R. Brigham*.

CASSODAY, C. J. For years prior to June 16, 1883, the firm of McGeoch, Everingham & Co. conducted an extensive business as brokers and commission men on the Board of Trade in Chicago, and had a paid-in capital of $150,000, of which the senior member, Peter McGeoch, had contributed one half, and the other four members of the firm, who are named as defendants herein, but none of whom were served

with the summons or appeared in this action, contributed the other half. During the time mentioned, Peter McGeoch resided in Milwaukee and conducted business there on his own account. For some time prior to the lard deal in question, Peter McGeoch and the defendant *Wells* had jointly conducted wheat and other deals, through the firm of McGeoch, Everingham & Co. as their brokers and commission men, on the Board of Trade in Chicago, and, as a result of such deals, Peter McGeoch and *Wells* each had a large balance to his personal credit with the firm of McGeoch, Everingham & Co.— the amount so to the credit of *Wells* being upwards of $200,000.

While things were in such condition, and about February, 1883, Peter McGeoch and *Wells* conceived the project of creating a corner in the Chicago market on lard, and for that purpose they jointly, through the firm of McGeoch, Everingham & Co., commenced and continued buying up the entire lard product of the Chicago market, and a great deal more, and in doing so entered into numerous contracts for the delivery of lard in June and July, 1883. The extent of such purchases, according to the testimony of McGeoch, exceeded 200,000 tierces, and the liabilities thereby incurred were several millions of dollars. None of such purchases or contracts were made in the name of McGeoch and *Wells*, but in the name of McGeoch, Everingham & Co., and appeared in their books under an account known as "41;" and all warehouse receipts were taken in the name of McGeoch, Everingham & Co. In making such purchases, McGeoch, Everingham & Co. had borrowed from several banks, including the plaintiff bank, $3,900,000, and had secured the payment thereof to the respective banks by depositing, as collateral security therefor, warehouse receipts so taken by them. The loans so made by that firm from the plaintiff bank, and by it placed to the credit of that firm, aggregated $500,000, and the warehouse receipts so deposited by them

with the plaintiff, as collateral security therefor, were for 15,000 tierces of cash lard; but, as indicated in the foregoing statement, each of the four notes held by the plaintiff was indorsed or signed by *Wells* and Peter McGeoch, respectively, so as to make them each personally liable to the plaintiff, under the law of Illinois, as makers or guarantors.

Unable to borrow more money or longer conduct their business, the firm of McGeoch, Everingham & Co. failed June 16, 1883. Prior to such failure, and pending the lard deal, and for the purpose of continuing the same, McGeoch and *Wells* had borrowed from banks on their own account, and sent to McGeoch, Everingham & Co., $950,000, of which amount *Wells* had contributed $675,000, and Peter McGeoch had personally contributed the balance. Thereupon, and on the same day, Henry Botsford, a creditor of McGeoch, Everingham & Co., and one of the directors of the plaintiff bank, commenced a suit in equity in the superior court of Cook county, Illinois; and such proceedings were had therein that one John R. Bensley was appointed a receiver of all the property and assets of that firm. On June 18, 1883, Bensley qualified as such receiver, and at once took possession of such property and assets and the office of McGeoch, Everingham & Co., and at once commenced investigating the affairs of the firm, and continued such investigation about a week before he could approximately ascertain the probable amount of the property and assets upon which he, as such receiver, could realize. After he had so ascertained, and consulted his attorney, he appears to have concluded, of his own volition, to interview the parties, with the view of obtaining a settlement. Through the intervention of a Chicago member of the firm of McGeoch, Everingham & Co., he obtained an interview with Peter McGeoch and *Wells* at Milwaukee about June 25, 1883. Such meeting was not solicited by either McGeoch or *Wells*. He proposed that McGeoch and *Wells* should raise half a million

dollars, and, if they would do so, he would undertake to clear the wreck, and, if possible, settle with the parties at fifty cents on the dollar. Finally he agreed that, if McGeoch and *Wells* would promise to raise $450,000 in money promptly, he would undertake to effect a *settlement* and procure releases from all the creditors. Neither *Wells* nor McGeoch submitted any proposition, and neither authorized him to make any statement on their behalf with respect to their financial condition.

The receiver thereupon returned to Chicago and commenced getting the data for a statement to be made to the creditors. He caused it to be announced upon the Board of Trade that there would be a meeting of the creditors of McGeoch, Everingham & Co. held in the call board of the Board of Trade on the afternoon of July 2, 1883. He attended and presided at that meeting. He read to the meeting a written statement he had previously prepared, to the effect that the affairs of the firm *were in great confusion;* "that the amount due the trade at the time of the failure was $1,803,384.58, deducting margins surrendered and to be surrendered to the members of the board, $1,194.911.21; . . . that the notes of the firm at the various banking institutions amount to $3,950,000, secured by the deposit of lard as collateral;" that as near as he could estimate the net proceeds of the lard would be $3,800,000, " leaving a net deficit due the banks of $150,000, which, added to the amount to the members of the board, leaves their unsecured liabilities $1,344,911.21;" that he not taken the country accounts into consideration, as he assumed that the amount due from the country would provide for the indebtedness to the country; that he had in his possession cash and cash assets aggregating a trifle over $200,000 in value; that he had had an interview with McGeoch, his friends, and attorney, at Milwaukee; that he had finally, and after much hesitation on the part of McGeoch's friends, received the promise of

McGeoch that, if an entire settlement of the indebtedness of the firm could be made, he would "raise $450,000 in cash immediately upon the acceptation of the compromise;" that that would give the receiver $650,000, or nearly fifty cents on the dollar of the entire unsecured indebtedness; that the *firm* submitted a *proposition* to pay fifty per cent. in cash if all the creditors would sign the agreement; that such *settlement* would involve the necessity of dismissing all suits, attachments, and injunctions, in order to raise the money upon the property, but that the attachments on the real estate need not be released until they were ready to exchange the papers for the money; that he had secured the best proposition possible; that he was fully satisfied that, if the proposition was not accepted promptly, the creditors would never receive anything like the amount thus offered; that no *compromise* would be entered into that did not involve the acceptance by all the creditors; that *Wells* did not appear as a partner in the firm, and that his name did not appear upon the books, but it was conceded that he had some undefined interest with McGeoch, personally, in lard through the house; that *Wells* was reputed to be wealthy, but that he was seventy-five years old, and had heavy liabilities then due or about to become due, to which he had pledged nearly all his available property; that he therewith submitted to them "the proposition of McGeoch, Everingham & Co. in the above compromise "•for their signature (which proposition is set out in full in the sixth finding of fact in the foregoing statement); that when all had signed he would use every possible effort to obtain the money promptly and make immediate distribution of the same; that, " should the proposition fail of being accepted," it was his " candid judgment that the $450,000 promised " would "*never be realized;*" and that the matter would "*only terminate after long, vexatious, and fruitless litigation.*"

Thereupon Alexander Geddes, C. D. Hammel, and C. J.

Zinger were nominated by persons in the crowd to act as a committee on behalf of the creditors for the purpose of securing the signatures of the creditors of McGeoch, Everingham & Co. The receiver put the motion and it was carried, and that committee circulated such proposition of compromise. The same had been signed by nearly all the creditors of the firm represented on the Board of Trade on and prior to July 16, 1883. About that time McGeoch paid to the receiver $225,000, as promised, and about July 19, 1883, *Wells* paid the $225,000, as promised, and he and McGeoch, in consideration thereof, received from McGeoch, Everingham & Co. a full release and discharge from any and all liabilities. Up to that time the receiver had realized from the assets of McGeoch, Everingham & Co. about $300,000. The plaintiff signed the proposition of compromise July 20, 1883, and appears to have been the last creditor to sign. From the time of such failure to the time of signing such compromise, five of the nine directors of the plaintiff bank were members of the Board of Trade, and the plaintiff's cashier was on the Board nearly every day. The great bulk of the creditors were paid by the receiver, and gave him their release and discharge, on or about July 21, 1883. On July 28, 1883, the plaintiff's board of directors passed a resolution to accept the fifty cents on the dollar and release the firm of McGeoch, Everingham & Co. On August 25, 1883, the plaintiff sent to the receiver a statement purporting to give the amount it had realized on the sale of the lard held by it as collateral, from which it appeared that there was still due the plaintiff $51,833.94, and thereupon the receiver, in pursuance and in accordance with such proposition of compromise, paid to the plaintiff $25,916.97, and at the same time took and received from the plaintiff the receipt, satisfaction, and discharge set forth in full in the seventh finding of fact contained in the foregoing statement. The receivership proceedings were thereupon terminated, and the receiver discharged.

Ignoring such settlement, and nearly five years after it had been made, the plaintiff commenced this action to recover the other fifty cents on the dollar of such alleged balance. McGeoch and *Wells* separately answered, setting up such compromise, satisfaction, and discharge in bar of the action, and also alleged, by way of equitable counterclaim, unnecessary delay and bad faith and want of ordinary care in the disposition of the lard held by the plaintiff as collateral security, and claiming that the notes sued upon were fully paid, and asking for an accounting. Under our statute the defensive portion of the answer pleading such discharge was deemed controverted by the plaintiff, as upon a direct denial or avoidance, as the case might require. R. S. sec. 2667; *Leslie v. Keepers,* 68 Wis. 123. The result was that, upon the trial, the plaintiff sought to avoid such discharge by claiming that its signature to the compromise and settlement, and to the receipt, satisfaction, and discharge, had been procured by fraud, without alleging any specific acts of fraud. The contention of the respective parties on the trial, as to such frauds, may be inferred from the nine questions submitted to the jury by the special verdict,— especially as neither party requested the submission of any additional questions.

1. One of the principal claims of fraud is the paying of the Union National Bank more than fifty cents on the dollar. By the fourth and fifth findings of the jury, it was, in effect, found that the plaintiff so signed on condition that the Union National Bank should sign and that that bank and all creditors should accept fifty cents on the dollar; but they also found that, before the plaintiff accepted the money and gave the release, it knew that the Union National Bank had been paid or secured in full by the committee named. This finding is challenged, but we all think it is sustained by the evidence. Error is assigned because the court admitted in evidence a copy of the Chicago Tribune of Sunday, July 27, 1883, giving an account of the payment of the Union Na-

tional Bank's claim having been secured in full by the committee mentioned giving their personal bond for the same. It is admitted that both the president and cashier of the plaintiff bank were accustomed to take and read the Chicago Tribune at that time, but there is no evidence that either of them read or received that particular Sunday issue. Under the repeated rulings of this court, we must hold that the article was admissible. *Young v. Tibbitts,* 32 Wis. 79; *Gilchrist v. Brande,* 58 Wis. 200. The fact that a majority of the plaintiff's directors were members of the Board of Trade, that its cashier was frequently there, and the fact that such security in full of the Union National Bank became publicly and generally known on the Board of Trade and in the city, were circumstances admissible in evidence. 1 Greenl. Ev. § 138; *Lovejoy v. Spafford,* 93 U. S. 430. Thus, it is established as a verity in the case that the plaintiff, with full knowledge that payment to the Union National Bank had been secured in full by the committeee, accepted the $25,916.97 as a settlement, and executed and delivered the discharge in question, notwithstanding the condition it had exacted when it signed the consent to settle, as indicated. Nor do we think there was any error in charging the jury on the subject of notice, as to such preference, or as to the corner on lard. They were expressly told that the plaintiff was not chargeable with the knowledge of its directors acting as individuals, nor with the knowledge of the plaintiff's officers having nothing to do with the compromise and settlement. The court merely allowed the jury to take into consideration the circumstances tending to prove knowledge on the part of the plaintiff, including the matters mentioned.

2. Another specific claim of fraud litigated before the jury was whether William Young & Co. were induced to sign the consent to settle by the promise of Peter McGeoch to pay them in full; but the jury found against the plaintiff by their sixth finding, as indicated, and the court, by its

Continental National Bank of Chicago vs. McGeoch and others.

twelfth finding, found, in effect, that no such promise was made.

3. The mere fact that *Wells*, on the day of the failure, June 16, 1883, gave to the National Bank of America certain collaterals to an indebtedness upon which he was personally liable, and that that bank thereafter voluntarily signed the consent to settle, and settled for fifty cents on the dollar, as found in the thirteenth finding, furnishes no ground for invalidating the settlement and discharge in question.

4. By the ninth, fourteenth, nineteenth, and twentieth findings, the court, among other things, found, in effect, that the receiver, Bensley, made no false or fraudulent statements or representations in respect to the assets or liabilities or the financial condition of said firm or of said *Wells;* that no fraud was used in the procurement of the signatures of the plaintiff to the composition agreement; that there was no fraud in the procurement from the plaintiff of the contract of settlement and release, dated August 25, 1883; that *Wells* was not guilty of any fraud which, it is claimed, invalidated the composition; that the debt upon which this action was brought was fully and fairly compromised and released by the composition of July 2, 1883, and the contract of release of August 25, 1883, signed by the plaintiff. Certainly, as indicated, the statements made by Bensley to the Board of Trade were, in the main, general and not specific, and, from his known limited acquaintance with the affairs of the firm, must have been made and understood as a mere estimate or opinion,— especially as he had premised his statements with observations to the effect that he found the affairs of the firm in great confusion; that, as close as might then be estimated, he found things so and so; that the country accounts were not yet fully ascertained, but were assumed to be so and so; and other expressions. *Mosher v. Post*, 89 Wis. 602.

5. Such are all the claims of fraud, bearing upon the va-

lidity of the compromise and settlement, submitted to or determined by the trial court or jury. Nevertheless, it is strenuously contended that such compromise and settlement should be declared void and no bar to this action, by reason of evidence in the case to the effect that, July 19, 1883, Bensley, as receiver, gave a check payable to the order of Flower, Remy & Gregory, attorneys for George C. Eldridge & Co., for $46,671.84, being one half of the indebtedness due them, and the same was placed to the credit of such attorneys in the First National Bank; that on the same day he gave another check payable to the order of Pool, Kent & Co. for $42,653.12, being one half of the indebtedness due them; that five or six days afterwards, Bensley, as such receiver, gave a check, payable to George C. Eldridge & Co., or order, for $3,500, and another check payable to Pool, Kent & Co. for $3,500; that "the checks representing $3,500 each were given to these firms *in payment for attorneys' fees* which they *claimed* to have incurred in the *attachment suits* that had been commenced, and which *they released upon condition;*" that he "paid the $3,500 to each firm because" he "thought it was just and equitable, and that they should be recompensed *for the expense already incurred,* and, in general, to get along with the composition;" that he paid such attorneys' fees on his own judgment and not by the authority or direction of either *Wells* or McGeoch. It will be observed that, in submitting the proposition of McGeoch, Everingham & Co. to the Board of Trade, July 2, 1883, Bensley stated: " This will involve the necessity of the *dismissal of all suits, attachments, and injunctions,* in order that the money can be raised upon the property. The attachments on the real estate will not necessarily have to be released until we are ready to exchange the papers for the money." And the written " proposition of compromise " of the firm, so submitted and signed by the creditors, was expressly " in full settlement and liquidation of all unsecured claims, and the defi-

ciencies upon all secured claims after applying the margins and collaterals up as security therefor." Accordingly, the plaintiff received 100 cents on a dollar of its claims, to the amount of nearly $450,000, by virtue of the lard it held as collateral. But it is contended that it does not appear, from competent evidence, that the $3,500 so paid in each of the two cases mentioned, was received by the attorneys of said firms, respectively, *as and for attorneys' fees*, or to relieve any of the property of McGeoch, Everingham & Co. from such attachments; but, as indicated, the plaintiff proved that it was paid for that purpose, and there is no evidence to the contrary, nor that George C. Eldridge & Co. or P·ol, Kent & Co. received any more than fifty cents on the dollar. Besides, it does affirmatively appear that the attorneys of George C. Eldridge & Co. actually received, and placed to their credit in the bank, the whole amount intended for their client. A month after these transactions, as we have already seen, the plaintiff, with full knowledge that payment had been secured in full to the Union National Bank, accepted payment and gave the discharge in accordance with the compromise, and thus, in the most emphatic way, condoned the supposed fraud. The discharge should not be set aside by reason of the payment of such attorneys' fees. *Cleaveland v. Richardson,* 132 U. S. 318; *Hanover Nat. Bank v. Blake,* 142 N. Y. 404; *Way v. Langley,* 15 Ohio St. 392.

It is to be remembered that the burden of proving any and all fraudulent preferences was upon the plaintiff; that, if it relied upon those transactions or either of them, or any other transaction not named, to establish such preferences, fairness required that it should have apprised the defendants of the facts upon the trial, by at least requesting the court to submit the question of such preference to the jury, especially as the plaintiff's pleadings fail to allege any fraud. For this court, in a complicated case like this, to review every claim of fraudulent preference, though not specifically

presented to nor determined by the trial court or jury, would be to inaugurate a new departure in practice, which would not only be embarrassing and misleading to the bench and bar, but tend to defeat the ends of justice. And certainly such practice should not prevail, where, as here, there are general findings of the trial court, covering all similar questions, against the party asking for such review. This court has frequently held that the failure to request the submission of particular questions was a waiver of any objection on the ground of such failure. *Schultz v. C., M. & St. P. R. Co.* 48 Wis. 375; *Hrouska v. Janke,* 66 Wis. 252; *Kenyon v. Kenyon,* 72 Wis. 234; *Wright v. Mulvaney,* 78 Wis. 89. There is no pretense that the verdict and findings do not cover all the material controverted and issuable facts; but the claim is to the effect that, although the jury and court found there was no fraudulent preference as to any of the specific transactions determined, yet there were other transactions from which such preference might have been found had the same been submitted and determined.

6. We find no evidence in the record that *Wells* or McGeoch, before or at the time of the settlement and discharge in question, had any knowledge or information that Bensley, or the committee, or anyone, gave or agreed or promised to give any more than fifty cents on the dollar on any unsecured indebtedness in favor of creditors represented upon the Board of Trade of the city of Chicago; much less, that they authorized or consented to such preference. But it is vigorously contended by the able counsel for the plaintiff that such authority, consent, or knowledge is unnecessary in order to avoid the settlement and discharge. This is put upon the broad ground that the transaction in question was, in legal contemplation, a composition with creditors, pure and simple. If such was the true nature of the transaction, then there is much force in the argument of counsel based upon such assumption. This makes it neces-

sary to consider what is meant by such composition, and the elements entering into the same, and the principle upon which such composition is binding.

A composition is defined to be "an agreement, made upon a sufficient consideration, between an insolvent or embarrassed debtor and his creditors, whereby the latter, for the sake of immediate payment, agree to accept a dividend less than the whole amount of their claims, to be distributed *pro rata* in discharge and satisfaction of the whole." Black, Law Dict. See 3 Am. & Eng. Ency. of Law, 385. It is well settled, as stated by counsel for the plaintiff, that the payment of a part of an undisputed liquidated debt does not discharge the debt altogether, even where it is expressly received in satisfaction of it. *Otto v. Klauber*, 23 Wis. 471; *Lathrop v. Knapp*, 27 Wis. 225; *Davenport v. First Cong. Society*, 33 Wis. 387, 391; *Lerdall v. Charter Oak L. Ins. Co.* 51 Wis. 429. The reason for this rule is that the payment of a part of an admitted debt which the debtor is bound to pay is no consideration for relinquishing the balance of the debt, nor can it be a satisfaction to such creditor for the whole debt. *Ibid.;* Bishop, Insolvent Debtors, 589, § 480, and cases there cited. It follows that there can be no binding composition of such a debt by such a debtor and a single creditor. Such is declared to be the general rule by the author last cited. "An apparent exception to the general rule of law stated," says the same learned author, "is found in the case of a composition by a debtor with *several* or all of his creditors, by which *they agree* to accept less than their entire demand. Such an agreement, if entered into with the debtor by a number of creditors, *each acting on the faith of the engagement of the others*, will be binding upon them; *for each*, in that case, *has the undertakings of the rest as a consideration for his own undertaking*." Bishop, Insolvent Debtors, 591, § 481. To the same effect, 3 Am. & Eng. Ency. of Law, 386. This proposition is abundantly supported by cases

there cited. Such a composition in such a case may be binding, even though resting in parol. *Mellen v. Goldsmith*, 47 Wis. 573; *Good v. Cheesman*, 2 Barn. & Adol. 328; *Boyd v. Hind*, 1 Hurl. & N. 947. These authorities are to the effect that the only consideration to make such a composition, in such a case, binding upon each creditor, is the undertaking of the other compounding creditors to give up a part of their claim. This court has frequently recognized the same principle. *Lathrop v. Knapp*, 27 Wis. 225; *Davenport v. First Cong. Society*, 33 Wis. 387; *Mellen v. Goldsmith*, 47 Wis. 573. Since, in such composition, the only beneficial consideration to any creditor to thus agree to give up and discharge a portion of his claim is a corresponding agreement on the part of the other creditors to give up and discharge a like proportion of their respective claims, it follows that any secret agreement by the debtor to pay some of such creditors more than others is a fraud upon such others, which enters into and forms a part of the only consideration upon which such composition is based, and hence necessarily avoids the same. But see *Hanover Nat. Bank v. Blake*, 142 N. Y. 404; *S. C.* 27 L. R. A. 33; *Way v. Langley*, 15 Ohio St. 392; *Cleaveland v. Richardson*, 132 U. S. 318.

While it is true, as indicated, that a debtor cannot, for want of consideration, make a binding composition with a single creditor of an undisputed and liquidated debt, yet it does not follow that such composition must necessarily be made with all the creditors. "An agreement, entered into between a debtor and any number of his creditors less than the whole number, to take a composition for their debts, is binding upon those who enter into the agreement; but such an agreement, entered into between a debtor and a single creditor, is void for want of consideration." 3 Am. & Eng. Ency. of Law, 389, and cases there cited. "It seems to be fully settled by the authorities," says Mr. Bishop, "that a composition agreement between a debtor and a portion of

his creditors is valid and binding. The consideration of the relinquishment of a part of their claim by the others is sufficient to make the promise and discharge of each of those who join obligatory." Bishop, Insolvent Debtors, 594, § 484, and cases there cited. The agreement in question, therefore, even if we assume it to be nothing more than a composition, was not void merely because it was not signed by all the creditors. The proposition was only addressed, "To the Creditors of the Firm of McGeoch, Everingham & Co., Represented upon the Board of Trade of the City of Chicago," and it only purports to be an agreement between such of said creditors as were unsecured.

7. Before determining the precise nature of the agreement, it may be well to consider what additional fact or consideration is essential to convert what would otherwise be a mere composition, as indicated, into a compromise, settlement, or accord and satisfaction. These terms are well understood by the profession. A compromise is defined to be: "A settlement of differences by mutual concessions." Cent. Dict. "A mutual yielding of opposing claims; the surrender of some right or claimed right in consideration of a like surrender of some counterclaim." Anderson, Law Dict. The dispute or opposing claims may arise from some uncertainty in regard to the facts or the law and the facts together. Black, Law Dict. A settlement may be made in the same way; and, even where there is no dispute or controversy, as by accounting together and striking a balance, or agreeing upon the amount to be paid upon an unliquidated claim. *Ibid.* "Accord and satisfaction is the substitution of another agreement between the parties in satisfaction of the former one, and an execution of the latter agreement," and "forms a complete bar to any further action on the original claim." 1 Am. & Eng. Ency. of Law, 94. A settlement by the parties of their mutual accounts or dealings is conclusive, unless impeached for mutual mis-

take or the fraud of one of the parties; and proof of such mistake or fraud must be clear and convincing. *Martin v. Beckwith*, 4 Wis. 219; *Wilson v. Runkel*, 38 Wis. 532; *Klauber v. Wright*, 52 Wis. 313; *Hoyt v. McLaughlin*, 52 Wis. 280; *Case v. Fish*, 58 Wis. 108; *Hawley v. Harran*, 79 Wis. 381. "An adjustment and compromise of a *bona fide* controversy as to matters which are fairly the subject of debate between the parties at the time of such compromise, each party acting with full knowledge of the facts, and no element of fraud or of serious or injurious mistake intervening, will always be upheld by the courts." *Kercheval v. Doty*, 31 Wis. 476; *Van Trott v. Wiese*, 36 Wis. 439; *Zimmer v. Becker*, 66 Wis. 527; *Woodford v. Marshall*, 72 Wis. 132; *Hennessy v. Bacon*, 137 U. S. 78.

In *Kercheval v. Doty, supra,* DIXON, C. J., on page 487, quotes approvingly from standard authors, to the effect that a compromise of a doubtful right will not be opened or rescinded, even when unequal or harsh in its operation, nor where the only consideration for the relinquishment of a valid claim on the one side is the abandonment of an invalid claim on the other side; that "if it were necessary, in order to sustain an adjustment of conflicting claims, to determine their relative validity and value, no compromise would be possible, and the uncertainty, delay, and scandal would be incurred which such arrangements are usually designed to avoid;" that "compromises are to be favored, irrespectively of the nature of the controversy compromised; and that they cannot be set aside because the event shows all the gain to have been on one side and all the sacrifice on the other, if the parties have acted in good faith and with a belief of the actual existence of the rights which they have respectively waived or abandoned. Hence, when a compromise has been fairly effected, its validity will be independent of the merits of the controversy on which it is founded, and it cannot be reopened for the purpose or with the effect of

reviving the dispute which it was meant to terminate." A compromise of a doubtful claim is a good consideration for a promise to pay money, and it is no answer to an action brought upon such promise to show that the claim was invalid. *Griswold v. Wright*, 61 Wis. 197, and cases there cited; *Hewett v. Currier*, 63 Wis. 394; *Saxton v. McNair*, 71 Wis. 459; *Hennessy v. Bacon*, 137 U. S. 78. "The payment of a less sum than the demand is a satisfaction when the debt is unliquidated." Bishop, Insolvent Debtors, 590, § 480, and numerous cases there cited. "An agreement by a creditor with a third person to accept from him less than the demand against the debtor in satisfaction of it is valid and may be enforced," and "so the acceptance of a note of a third person for a less sum than the debt due, in full payment, is a bar to an action to recover any portion of the debt beyond the sum secured by the note." *Ibid.* See, also, *Brooks v. White*, 2 Met. 283; *Guild v. Butler*, 127 Mass. 386; *Clark v. Abbott*, 53 Minn. 88.

It may be said, in a general way, that where there is some new or independent consideration, or the creditor receives some additional benefit or legal possibility of benefit or advantage to which he would not have been entitled except for the new agreement, then the acceptance of a lesser sum in full payment of an admitted, liquidated debt will operate as an accord and satisfaction; and hence, in the absence of fraud or mutual mistake, the same is conclusive upon the parties. Bishop, Insolvent Debtors, 591, § 480; *Jaffray v. Davis*, 124 N. Y. 164; *Allison v. Abendroth*, 108 N. Y. 472. In this last case, ANDREWS, J., in effect said that, when the debtor enters into a new agreement with the creditor to do something which he was not bound to do by the original contract, the new agreement is a good accord and satisfaction if so agreed; and hence that the acceptance of the sole liability of one of two joint debtors or copartners in satisfaction of the joint or partnership debt is binding upon the

parties. So it seems that where the mode or time of part payment is different from that provided for in the original contract, whereby a new benefit is or may be conferred or a burden imposed, a new consideration arises out of the transaction, which gives validity to the agreement of the creditor. *Rose v. Hall,* 26 Conn. 392; *Jaffray v. Davis,* 124 N. Y. 169; *Schweider v. Lang,* 29 Minn. 254; *Boyd v. Moats,* 75 Iowa, 151; *Jaffray v. Crane,* 50 Wis. 349.

8. The case at bar is complicated, but we are constrained to hold that the transaction in question was something more than a mere composition among creditors, and that it was, in legal effect, a compromise, settlement, and accord and satisfaction, within the principles stated, especially so far as *Wells* and Peter McGeoch are concerned. As already indicated, the immense indebtedness of McGeoch, Everingham & Co. was largely incurred by the attempt of *Wells* and Peter McGeoch, through them, to corner the Chicago market in lard, and only failed for want of funds. This is, in effect, found by the trial court. The jury found that, at the time of discounting the notes in suit, the plaintiff knew that McGeoch, Everingham & Co. were so engaged in attempting to corner the Chicago lard market, but did not know that the loan made was needed and procured by them for that purpose. The illegality of such attempt to corner the market seems to be conceded, and in the records of this court in one case was fully demonstrated. *Wells v. McGeoch,* 71 Wis. 196. Such want of knowledge on the part of the plaintiff seems to have been regarded as essential to bar the defense of illegality upon the merits. To support the compromise, settlement, or accord and satisfaction,— whatever it may be called,— it was only essential that there was ground for claiming in good faith that the transaction was illegal; not that it was in fact illegal. The proposition was submitted to the creditors as a compromise and settlement, and the creditors were at the same time told by Bensley

that, if they failed to accept the proposition of *Wells* and McGeoch to compromise and settle upon their contributing $450,000, then, in his judgment, they would never realize as much, and that the matter would "only terminate after long, vexatious, and fruitless litigation." Such statement manifestly referred to the validity of the claims of the respective creditors so represented on the Board of Trade. Of course, such creditors must have had some knowledge or belief as to the validity of their respective claims and hence the advisability of agreeing to such compromise. Since the validity of such claims was at least questionable, it constituted a good consideration for the accord and satisfaction or settlement.

There are other phases of this case which, of themselves, constitute such consideration. The compromise agreed to contemplated the doing of something by *Wells* and Peter McGeoch which they were not bound to do by the original contract, and hence the new agreement, when executed, constituted a binding accord and satisfaction, under the authorities cited. True, McGeoch was a member of the firm of McGeoch, Everingham & Co., the ostensible principal debtors as to all liabilities covered by the compromise; but there is no pretense that *Wells* was a member of that firm or that he had any connection with them other than as indicated. He, manifestly, occupied the position of a third party to the transaction, and so did McGeoch, in the sense that a member of a firm does when he uses his own money or property by way of accord and satisfaction of his firm's debts. True, *Wells* and McGeoch were, in one form or another, personally liable to the amount of several hundred thousand dollars (including the plaintiff's claims) of the indebtedness of McGeoch, Everingham & Co. covered by the compromise; but it is also true that such compromise covered other debts of that firm to the amount of nearly $400,000 for which McGeoch was only liable as a member of that firm, and for

which *Wells* was not liable in any way. Thus, it appears that more than one quarter of the $450,000 which *Wells* and Peter McGeoch personally contributed in equal amounts to effect that compromise was intended to be used, and was used, in settling claims for which McGeoch was only liable as a member of the firm of McGeoch, Everingham & Co. and for which *Wells* was not liable at all. Certainly, a compromise thus induced and secured should not be regarded void as against *Wells* and Peter McGeoch, who furnished most of the money to effect the same, and in the absence of any fraud or deceit on the part of either of them, and especially in a suit commenced nearly five years after the compromise.

9. The written proposition, acceptance, and discharge must be taken together in considering the true nature of the transaction. The proposition was for a "*compromise*, to be received by each creditor in *full settlement and liquidation* of all *unsecured* claims," owned by those represented upon the Board of Trade in Chicago. The amount of each claim was to be "*settled and adjusted*" by the receiver or arbitrators. The acceptance in writing of such proposition was on the same paper and immediately below the same, and was signed by the plaintiff and other creditors, and recited that they, as "creditors of the firm of McGeoch, Everingham & Co., *in consideration* of the prompt *settlement* above proposed, *and to avoid litigation*, hereby [thereby] accept the above *settlement* as aforesaid." The discharge signed by the plaintiff acknowledges the receipt of $25,916.97 "as a *full compromise and adjustment of the validity*, and in final *settlement, satisfaction, and discharge*, of all claims and demands of the undersigned against said firm and individuals." These same writings have once been construed by this court in harmony with the construction now put upon them. *Ball v. McGeoch*, 81 Wis. 172, 173. We must hold that they constitute something more than a mere agreement among creditors to ac-

cept fifty per cent. of their respective admitted and liqui-
dated claims, and that they are just what they purport to
be; and upon this record they must be regarded as conclu-
sive evidence of a compromise, settlement, and accord and
satisfaction.

10. There is another feature of this case calling for brief
consideration.   The plaintiff disposed of the lard held by it
as collateral, and stated to the receiver that the *net* proceeds
thereof were $448,166.06.   The compromise and settlement
were for the balance, after applying such net proceeds. The
jury found that the plaintiff did not dispose of the lard in
good faith, nor in the exercise of ordinary care, and that
in consequence thereof considerably less was realized upon
such collaterals; and the court found that, if the plaintiff
had disposed of the lard in good faith and in the exercise of
ordinary care, it would have realized enough to have fully
paid all of its claims.   Whatever may be the merits or de-
merits of such findings, we are clearly of the opinion that
the time and manner of disposing of such collaterals and the
amount of the net proceeds realized thereon were covered
by and included in the settlement, and the same is binding
upon the defendants.

*By the Court.*— The judgment of the circuit court is af-
firmed.

WINSLOW and PINNEY, JJ., dissent.

As to accord and satisfaction by part payment, see note to *Fuller v.
Kemp* (138 N. Y. 231) in 20 L. R. A. 785.— REP.