### WILLIS v. CITY NAT. BANK OF GALVESTON. (No. 8714.)*

(Court of Civil Appeals of Texas. Galveston. Dec. 3, 1925. Rehearing Denied Jan. 14, 1926.)

1. **Compositions with creditors ⬷═2 — Retention of cashier's check, sent in pursuance of compromise agreement, held to estop creditor from recovering on principal debt.**

Where, in pursuance of compromise between debtors constituting firm and creditors, cashier's check was sent to creditor, which had not assented thereto, representing its proportionate share of payment by one of debtors, retention of such check over year, with knowledge of all such proceedings, constituted acceptance of money as matter of law and prevented such creditor from recovery for rest of its claim.

2. **Accord and satisfaction ⬷═11(2)—Compromise and settlement ⬷═5(2)—Retention of cashier's check by creditor held valid accord and satisfaction of unliquidated demand.**

Although, as general rule, in absence of insolvency, mere agreement to accept smaller sum than due does not constitute accord and satisfaction of claim, based on liquidated or undisputed demand, claim of creditor for balance due after cotton hypothecated should be sold was unliquidated demand, and acceptance and retention over one year of cashier's check, sent it as its proportionate share of part payment under composition agreement, debtor being insolvent, although it did not cash such check, constituted valid accord and satisfaction preventing such creditor from later recovering on its claim against any of debtors.

Appeal from District Court, Galveston County; J. C. Canty, Judge.

Action by the City National Bank of Galveston against Floyd Willis and others. Judgment for plaintiff, and defendant Willis appeals. Reversed and rendered.

Neyland & Neyland, of Greenville, and Terry, Cavin & Mills, of Galveston, for appellant. C. G. Dibrell and McDonald & Wayman, all of Galveston, for appellee.

GRAVES, J. In this action, the City National Bank of Galveston sued Floyd Willis, E. L. Edmonson, and J. J. Lowrey individually and as members of the firm of J. J.

Lowrey & Co., cotton merchants, who maintained offices at Galveston, Tex., and New Orleans, La., for a balance alleged to be due for advances the bank had furnished the cotton firm with which to buy cotton. The suit was dismissed as to Edmonson for want of service, and judgment went against the firm and the other two members in favor of the bank for $10,906.02, with interest from its date. Floyd Willis alone appeals.

Because of a federal statute permitting it in that manner to loan a larger per cent. of its capital, the bank had carried the account against the firm for these advances on its books as bills of exchange, which consisted of drafts drawn from the interior by sellers thereof on the cotton firm for the amount of sales to them of cotton with bills of lading therefor attached, which drafts the cotton firm had accepted, indorsed, and turned over, along with the accompanying bills of lading, to the bank. The transactions here involved occurred in 1920 prior to September 1st of that year, on which date the cotton firm, by mutual consent, had been dissolved. When the drafts forming the basis of the debt here sued upon were taken up by the bank, they were secured by such bills of lading covering 309 bales of cotton, which were put in a warehouse at Galveston, and its receipts therefor issued to the bank. The bank sold 9 bales of this cotton in October, 1921, and the remaining 300 bales in June, 1922, crediting what it claimed to have been the proceeds thereof on those dates upon this bill of exchange account against the cotton merchants.

Stating it only in the most general terms, those sued defended in the court below upon two main grounds: (1) That they had made a composition, in which the bank's debt was compounded on the basis of $10,000 at that time, and that it had received and retained for an unreasonable length of time its pro rata part of that settlement, and was therefore bound by it; (2) that the bank had made an unauthorized sale in June, 1922, of the 300 bales of cotton it held as security, in that it had without warrant in fact and law disposed of the same at private sale without notice to them, and had therefore converted the same to its own use and benefit, to their damage in a sum equal to the highest price the cotton could have been sold for between the date of the alleged conversion and that of the trial of this cause.

They further complained that the bank had charged 8 per cent. interest instead of 6 per cent. interest on the account against them, had compounded the interest monthly, and had also failed to credit them with a balance left in their checking account of $2,868.

Appellant, Willis, at great length makes all the same contentions in this court, but, under the conclusion that the first one of them presents a complete answer to the suit, we

do not find it necessary to directly discuss the others.

Happily the material facts relating to the composition matter as affecting both sides of this litigation, being in the main reflected in written correspondence, are practically undisputed, and may, we think, be fairly summarized in this way: For some years prior to the inception of these drafts the same kind of business had been carried on between Lowrey & Co. and the bank; the former maintaining an office and local representative at Galveston, the situs of the latter. Soon after the dissolution of the cotton firm on September 1, 1920, it became evident that they had in fact been insolvent and unable to pay in full obligations originating prior to that date, as had the appellee bank's claim, which it began about the same time to press for payment or additional security to the 309 bales of cotton on hand. It began these demands as early as November 10, 1920, receiving a $1,500 credit on December 20, 1920, but renewing and continuing them soon thereafter and until February 28, 1921, when, in reply to one of them of date February 25, 1921, Lowrey & Co., by letter advised the bank point-blank that their entire capital had been swept away and they were then unable to do anything. Inclusive of this last-mentioned letter, and between its date and the dates of the sale of the cotton by the bank, there were several letters between the parties making references to the condition of the market, the outlook for sales, etc., which, for lack of bearing upon the subsequent composition proceedings, need not be further gone into, except to note that in the firm's letter to the bank of April 13, 1921, it was again directly informed that they had no prospect of being able to make it any payments. During the summer of 1921, it became evident that the firm was not only greatly embarrassed financially, but in reality was insolvent, in consequence of which situation they prepared· a settlement with their creditors. In answer to their letter to that effect of July 1st, the bank, on July 15, 1921, wrote them that, "before attempting to reach a conclusion in the matter," it desired information upon what portion of their listed assets were up as security and to whom, what the individual assets and liabilities of all the three members of the firm were, and whether or not their proposal of settlement was to give their notes for 50 per cent. of the balance that would be due on their indebtedness after applying thereon the value of their pledged assets. This information was furnished in a reply of July 25th, following, in which it was stated that the proposal was to give notes for the 50 per cent. balance as inquired about; that the firm would still owe approximately $340,000 after all its cotton has been disposed of; that no one of its members at that time had anything; and that creditors representing fully 90 per cent. of the indebtedness had already accepted the settlement offer. To this letter of July 25th the bank responded on July 30th, thereafter, saying it would not be interested in the proposition submitted. Again on August 4, 1921, the bank, as in reply to a letter from Lowrey & Co. of August 2d, declined the 50 per cent. note settlement proposition, but stated, "We might consider a settlement of your account upon a 50 per cent. basis, provided the same is adequately secured;" a copy of this reply being also at the time mailed to Mr. Pool, president of the Marine Bank & Trust Company at New Orleans, in acknowledgment of and answer to a letter from him to the appellee presumably relating to the Lowrey proposal. Mr. Pool, it appears, had been acting for Lowrey & Co., with the general knowledge of appellant, Willis, in trying to bring about the settlement, which the appellee had thus for the second time declined to accept. On November 10, 1921, Mr. Pool wrote the president of the appellee bank calling his attention to this note settlement proposition on the 50 per cent. basis, saying the New Orleans banks had agreed to accept it, urging him also to agree, but asking, in event he could not, for the full status of his bank's claim, and suggesting that bankruptcy proceedings against the cotton firm had been talked of. Appellee's president responded on November 15, 1921, stating its debt at $28,981.27, less a credit of $1,473.44, against which it held the 300 bales of cotton, adding that its best offer up to that time on the cotton had been 14 cents, but that it was holding the same for 16 cents, hoped ultimately to realize that price, and closing with the sentence: "The cotton was misrepresented to us, or, at least, we think so, and it is not our purpose to compromise the matter, for we never do so under circumstances of this kind." Appellant, Willis, himself also refused to agree to this note settlement proposal, and it definitely fell through.

Thereafter, on December 31, 1921, the local creditors at New Orleans of Lowrey & Co. held a meeting there and agreed upon the following settlement of the firm's indebtedness to be accepted by all creditors before it was put through; the entire indebtedness to be compromised and settled for $150,000, paid and to be paid as follows: Lowrey and Edmonson were each to give their notes for $50,000, payable in six equal annual installments, while appellant, Willis, was to pay in $25,000 in cash and give his note for an additional $25,000, payable in three equal annual installments, the Marine Bank & Trust Company of New Orleans to act as trustee in the matter, the payment of the cash from Willis and the delivery of the notes from all the members of the firm to it as such to automatically release them all from any further liability to any of their creditors. Circular letters from an officer of this trustee bank, outlining the terms of this composi-

tion and asking its acceptance of them, were contemporaneously mailed out to all the firm's creditors. Subsequently all three members of the firm complied with the arrangement by Willis paying in the $25,000 and all of them executing and delivering their stipulated notes, and all their creditors, except the appellee and a bank in Belgium, accepted the settlement.

On January 25, 1922, Mr. Pool again wrote the appellee about the matter, for the second time giving the terms of the plan, which he stated all the other creditors had agreed upon, expressing willingness to have it come in for its proportion, but asking, if it could not, that it "so signify, and at the same time advise us what the amount of your claim is, what collateral, if any, you hold against it, and your estimate as to the value of the collateral." To this the bank replied on January 28th, saying it was then carrying the Lowrey account at $25,000, held as collateral 300 bales of cotton, which at that time could be sold for 12 cents a pound, and offering to release the firm from all further liability if they would, within 10 days from that date, pay it $5,000 in cash and permit it to keep the 300 bales of cotton. While further expressing the hope that Lowrey & Co. could see their way clear to accept this proposition, it neither expressly accepted nor declined the composition reiterated in the Pool letter of January 25th, to which it was thus responding.

Here the matter rested until May 4, 1922, when the trust officer of Mr. Pool's bank, the Marine Bank & Trust Company at New Orleans, sent to the appellee the following letter:

"May 6, 1922.

"City National Bank, Galveston, Texas.— Gentlemen: In re J. J. Lowrey & Co. Settlement. In connection with the above referred to matter, wish to advise that total amount of claims filed with us is $295,385.06. You will find inclosed our cashier's check No. 29465, for $846.35, covering amount of your pro rata of first cash payment of $25,000.00 made by Mr. Floyd Willis, member of the firm of J. J. Lowrey & Co.

"Kindly sign and return receipt which is herewith inclosed, covering amount received by you, and oblige,

"Very truly yours,
"AJC:MC Enc. Trust Officer."

The bank's cashier's check and the receipt form, as stated, were inclosed; the receipt reading:

"Received of the Marine Bank & Trust Company of New Orleans, trustee for J. J. Lowrey & Co., a late firm composed of J. J. Lowrey, Floyd Willis and E. L. Edmonson, the sum of $—— being the first payment of the settlement heretofore agreed upon between J. J. Lowrey & Co. and their creditors, by the terms of which the individual members of said firm are to be released from further liability."

More than a month after receiving these papers, the bank responded as follows:

"The City National Bank, Galveston, Texas.
"June 9, 1922.

"Mr. A. J. Crozat, Trust Officer, Marine Bank & Trust Company, New Orleans, La.— Dear Mr. Crozat: We are in receipt of your favor of June 6th, inclosing your cashier's check for $846.35, same being pro rata due us as a creditor of J. J. Lowrey & Co. Before accepting same we would appreciate it very much if you will advise us to what amount and extent we are shown as a creditor of the above-named company and how this was arrived at and what stand are taken concerning the collateral that we are holding.

"Several months ago we wrote Messrs. Lowrey & Co., requesting that they give us a copy of the financial statement of each individual connected with the company. For some reason or other they failed to supply us with this statement, and we are wondering if you have a copy in your possession and if you would be willing to forward same to us.

"Thanking you for your usual prompt attention, we are,

"Very truly yours,
"[Signed] Mads P. Jensen,
"MPJ:N.W. Cashier."

The Marine Bank's trust officer promptly furnished the specific information so asked for in this reply:

"Marine Bank & Trust Company,
"New Orleans, June 12, 1922.

"City National Bank, Galveston, Texas.— Gentlemen: Re J. J. Lowrey & Co. Settlement. Answering your letter of the 9th inst., regarding the above matter, we wish to advise that the amount of check remitted covered your pro rata of the first cash settlement, which is figured on a basis of $10,000.00, being amount advised by Mr. R. R. Neyland, representative of Mr. Floyd Willis, a member of the firm of J. J. Lowrey & Co.

"Regarding the financial standing of the individual members of the firm, wish to advise that we have no information in our possession, but are told that they have no money, possibly excepting Mr. Willis.

"We figured in accepting the settlement that it was the best possible for the benefit of the creditors.

"Yours truly, [Signed] A. J. Crozat,
"AJC:CS. Trust Officer."

Nothing further was heard from the appellee bank, which in the meantime had continued to keep the cashier's check, and on August 4, 1922, the New Orleans bank's trust officer further wrote it to this effect:

"Marine Bank & Trust Company,
"New Orleans, Aug. 4, 1922.

"City National Bank, Galveston, Texas.— Gentlemen: In re J. J. Lowrey Co. Settlement. The creditors of J. J. Lowrey & Co. have requested that we issue participation certificates in their respective names.

"We would appreciate it if you would kindly advise us whether or not you desire a partici-

pation certificate issued in your name in connection with the above matter. We made this request for the reason that our cashier's check sent you in connection with the first payment made by Mr. Floyd Willis, one of the members of the late Lowrey firm, has not been as yet accepted by you.

"Would you kindly let us hear from you at an early date what are your wishes in the premises?

"Yours truly,

"[Signed] A. J. Crozat, Trust Officer."

The appellee answered by letter of August 7, reciting:

"August 7, 1922.

"Mr. A. J. Crozat, Trust Officer, Marine Bank & Trust Co., New Orleans, La.—Dear Sir: Acknowledging receipt of your letter of August 4th, we wish to say that the J. J. Lowrey & Co. matter is in the hands of our attorney, who at the present time is in Europe on his vacation, and we wish to let the matter stand as it is until his return.

"Very truly yours,

"MPJ:N.W.                                Cashier."

The attorney referred to returned about October 1, 1922, but for more than one year thereafter and not until October 30, 1923, although all the while continuing to retain the New Orleans Bank's cashier's check, did any further sign or sound come from the appellee bank about the matter. On this last-mentioned date its attorneys began a correspondence with appellant, Willis, direct concerning it, which intermittently continued without material results through December 14, 1923; this suit ignoring the composition transaction and seeking recovery independently on its claimed balance of indebtedness, being filed by the appellee on January 8, 1924. Even then, however, it still held on to the cashier's check and now retains the same under this agreement between the attorneys for both sides to this suit of date January 28, 1924:

"January 28, 1924.

"Messrs. Neyland & Neyland, Greenville, Texas.—Gentlemen: In re City National Bank v. J. J. Lowrey et al. * * * City National Bank of Galveston has received from a New Orleans bank one or more checks or certificates of interest in a fund, which are said to be the proceeds of City National Bank's pro rata part of a composition with creditors of J. J. Lowrey & Co. City National Bank claims, and will claim, that it did not accept under this proposed settlement and that it intended to return, not later than to-day, the checks and certificates that it had received in this composition. Your Mr. Neyland has suggested that these documents be held until we can ascertain whether a settlement of the pending suit can be effected; it being understood that for all purposes it shall be treated as though these documents had been returned to-day. This, however, shall not be construed as in anywise waiving any defense that you may have to City National Bank's suit on the ground that the City National Bank's holding

of these documents constituted an acceptance of the composition.

"Very truly yours,

"JWW:M    [Signed]  McDonald & Wayman.

"This is a copy of our agreement.

"R. R. Neyland,

"1/28/24.          Atty. for J. J. L. & Co."

Further facts the evidence conclusively establishes are: That the creditors at the New Orleans meeting on December 31, 1921, at which the composition plan so subsequently consummated was agreed upon, had before them a substantially correct list of the names of and amounts due to all the creditors of the cotton firm, that of appellee bank, however, being an estimate of the balance that would be due it after deducting the reasonable value of collateral cotton it held, but certainly not exceeding either then or in May, 1922, when it received and kept the cashier's check, the $10,000 amount placed upon it; that the appellee, while it did as to the first or all note proposal of settlement twice expressly decline to accept, never at any time did so as to the executed composition of December 31, 1921, or even vouchsafe its purpose to, but in all its letters throughout the long holding period of the draft was either asking for information or delay "before accepting"— never refusing; that the amount of the cashier's check represented appellee's pro rata part of the composition made, its debt at that time not exceeding, if indeed equaling, the $10,000 estimate then placed upon it; finally, that in April, 1923, appellant, Willis, paid his first annual note under the settlement of $8,333.33, and stood ready to meet the remaining ones as they matured.

[1] We sustain the contention of appellant that the long-continued retention of the cashier's check by the appellee here, without in any way indicating its refusal to accept the terms of the settlement thereby evidenced, or offering to return the remittance, amounted in law to an appropriation thereof, constituted a full settlement as to it, and estopped it from recovering upon the original debt.

Throughout the pendency of both proposals of settlement this bank had full knowledge of all the recited facts, inclusive both of the continued insolvency during that period of all three members of the cotton firm and of the purpose for which the cashier's check it received and held had been sent. Its holding the same (the check being a bank's obligation, beyond the control of the debtors, and therefore money in its hands) in such circumstances for more than a year should be held as a matter of law to be an unreasonable length of time, and to not only constitute an acceptance of the money, but to bind the bank to the composition it reflected.

We think the following authorities support this general conclusion: 3 Williston on Contracts, §§ 1854, 1855, and authorities cited in footnotes 40–44, inclusive; Ostrander v. Scott, 161 Ill. 339, 43 N. E. 1089; Lapp v. Smith,

183 Ill. 179, 55 N. E. 717; Western Pacific Land Co. v. Wilson, 19 Cal. App. 338, 125 P. 1076; Day-Luellwitz Lumber Co. v. Serrell, 177 Ill. App. 30; Jenkins v. National Mut. Ass'n, 111 Ga. 732, 36 S. E. 945; Hamilton v. Stewart, 108 Ga. 472, 34 S. E. 123; Donovan v. Maloney, 3 Boyce (Del.) 453, 84 A. 1032; Conde v. Dreisam Gold Mining Co., 3 Cal. App. 583, 86 P. 825; Bloomquist v. Johnson, 107 Ill. App. 154.

Under these authorities, it was the affirmative duty of the bank in this instance, if it did not intend to accept the settlement, to promptly both repudiate it and return unused the check received. Not having done either at the time, it cannot now escape the consequences of its failure.

And this holding should obtain under facts like these, we think, notwithstanding the composition as initiated may by its terms contemplate acceptance by all the creditors, because it is not essential to its validity that all should accept in advance and one may as effectually bind himself by subsequent assent or acquiescence as by accepting the benefits of or acting under it, and when he does this, we further apprehend, as next herein appears, in a situation where his debtor within his full knowledge was in failing circumstances at the time, and with relation to an uncertain, unliquidated, or disputed demand, it is binding upon him, although it may not have been executed as to some other one of the originally named creditors. 12 Corpus Juris, § 50, p. 273; Farmers' Bank v. Sellers, 167 Ark. 152, 267 S. W. 593; 5 R. C. L. 868; International Shoe Co. v. Stewart (Tex. Civ. App.) 245 S. W. 723; Hunt on Accord, etc., §§ 1, 157; 165 R. C. L. 167; Continental Nat. Bank v. McGeoch, 92 Wis. 310, 66 N. W. 606; Day-Luellwitz v. Serrell, 177 Ill. App. 30.

[2] Furthermore, and independently of this question of a general composition as such, we think there was a valid accord and satisfaction between appellant and the bank, because (1) the retention of the check by the latter was equivalent to an acceptance thereof; (2) at that time appellant, as well as both other members of the cotton firm, were insolvent; and (3) the bank's claim against Lowrey & Co. could in its relation to this transaction in no proper sense be regarded as a liquidated one, since it was only for the balance that might be found to remain after the cotton on hand should thereafter be sold and applied thereon—an undetermined and indeterminate quantity, both when this settlement plan was instituted, and when the bank received and so held the check in furtherance of it. These special conditions take the case here out of the general rule, that, in the absence of insolvency, a mere agreement to accept a smaller sum than that due does not constitute full accord and satisfaction of a claim based upon a liquidated or undisputed demand. 1 Corpus Juris, Accord and Satisfaction, §§ 85, 86, 87, and authorities there cited; Hunt v. Ogden, 58 Tex. Civ. App. 443, 125 S. W. 386; Olson v. Burton (Tex. Civ. App.) 141 S. W. 549; Shoe Co. v. Stewart (Tex. Civ. App.) 245 S. W. 723. See, also, Shelton v. Jackson, 20 Tex. Civ. App. 443, 49 S. W. 415; Engbretson v. Seiberling, 122 Iowa, 522, 98 N. W. 319, 64 L. R. A. 75, 101 Am. St. Rep. 279; Wescott v. Waller, 47 Ala. 492; Seegmiller v. Kelley (Iowa) 99 N. W. 1131; Ostrander v. Scott, supra.

We do not understand the case of Lanes v. Squyres, 45 Tex. 382, to hold differently; upon the contrary, the claim there being liquidated, undisputed, and not shown to have been accepted in consideration of insolvency, it expressly recognizes that "circumstances alter cases" in this field of the law, and states the rule applicable to cases of the kind before us as follows:

"It is well settled, elementary in fact, that an agreement, not supported by a consideration, for a creditor to receive a less sum than the whole, will not discharge the debt. * * * There is a class of cases apparently within this rule, but which the law merchant, for reasons of public policy, places on a different basis. This class is embraced in what is generally denominated a composition, or an agreement, by a debtor in failing circumstances and a number of creditors to take a less sum in discharge of the whole. Nor does the rule stated above include compromises of disputed or doubtful claims. These are not only upheld, but are favored by the courts, and they do not, as in undisputed demands, require any other or distinct consideration to support them. In this case, defendants' proof shows that the debt was undisputed."

From what has been said it follows that appellee was not entitled to the recovery awarded; that action has accordingly been set aside, and this court's judgment that it take nothing by its suit herein has been entered.

Reversed and rendered.